STATE OF NEBRASKA, APPELLEE, V. DOUGLAS M. MANTICH,
APPELLANT.

543 N.W.2d 181

Filed February 9, 1996.   No. S–94–1091.

Christopher E. Kelly, of Fellman, Moylan, Natvig, Steichen & Kelly, for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

WRIGHT, J.

Douglas M. Mantich appeals his convictions for first degree murder and use of a firearm to commit a felony.

## SCOPE OF REVIEW

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within a jury's province for disposition. *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995).

Abuse of discretion is the standard of review applicable to an appeal from a district court's denial of a motion to transfer a pending criminal proceeding to the juvenile court. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990).

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994).

In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the trier of fact and takes into

consideration that the trial court has observed the witnesses testifying regarding the motion. See *id.*

## FACTS

On December 5, 1993, a group of people gathered at the home of Angelita DeLeon ostensibly to mourn the death of Michael Campbell, a member of an Omaha street gang known as the Lomas. Members of the Lomas attending the party included Mantich, Gary Brunzo, Daniel Eona, Juan Carrera, and Angel Huerta. Mantich testified that there was alcohol and marijuana at the party and that he drank between 5 and 10 beers and smoked portions of 2 marijuana cigarettes between 10 p.m. and 1 a.m.

During the party, there was discussion among the gang members about seeking revenge for Campbell's death. In his tape-recorded statement, Mantich said that Carrera and Eona were discussing stealing a car and doing a drive-by shooting at Ignacio Palma's grandmother's house. Palma was a member of a rival gang. When Carrera suggested stealing a car, Eona waved a gun and stated, "I ain't talkin' about stealin' a car, I'm talkin' about jackin' somebody putting a gun to their head." Huerta also told Mantich that he wanted to do a drive-by shooting of Palma's grandmother's house, and Mantich saw a gun in Huerta's possession at the party.

As people were leaving the party, Diane Barrientos, Mantich's girl friend, offered to give Carrera and Eona a ride home, but they refused. Eona told Barrientos that he intended to get a "G-ride" home. Barrientos understood this to mean that Eona intended to steal a car. Eona and Brunzo then walked toward Dodge Street, and Mantich waited in the street in front of DeLeon's house for them to return.

Eona and Brunzo returned 10 or 15 minutes later in a maroon 1989 Dodge Caravan owned by Michael Blankenau. Blankenau had previously loaned the van to Henry Thompson, who worked for Blankenau's cleaning service. Eona was driving, and Brunzo was in the passenger's seat. Carrera and Huerta got into the van, and Mantich attempted to join them. Barrientos testified that she pled with Mantich to go home with her and attempted to "hang" onto Mantich in order to prevent him from going, but he eventually got into the van. Mantich testified that he knew

when he entered the van that it was probably stolen. After Mantich entered the van, Eona drove toward 33d and Farnam Streets.

Mantich testified that when he entered the van he did not know that Thompson was in the van. Mantich stated that he learned Thompson was in the van soon thereafter. Thompson was seated on the floor of the van between the driver's and the passenger's bucket seats; he was facing the front of the van with his hands behind his head.

In his tape-recorded statement, Mantich said that after he entered the van, the group began taunting Thompson, demanding money, and saying "We're gonna shoot you" and "You're gonna die." Mantich stated that Thompson was crying and pleading with them not to shoot him. At trial, Mantich said that he and the other gang members were chanting things like "Cuz" and "Blood" in order to make Thompson think they were members of the Bloods, another Omaha street gang. Brunzo and Eona repeatedly jabbed the barrels of their guns into the side and back of Thompson's head. Prior to the shooting, Eona and Brunzo searched Thompson's pockets and took his wallet.

Mantich gave conflicting accounts of what subsequently occurred inside the van. In the tape-recorded statement given to Omaha police on January 5, 1994, Mantich recalled that while the group was taunting Thompson, Brunzo handed Carrera a gun, and Carrera handed the gun to Mantich. Members of the gang then began to urge Mantich to shoot Thompson. Mantich stated that at first he did not want to shoot Thompson, but the other members of the gang pressured him to do so. According to Mantich, the others were saying "you ain't down for Lomas," "shoot him," "you ain't got no heart," and "this is for MIKEY." Mantich stated: "I didn't know what to do and then I just got up. And I'm like this and I pull the trigger and then I give the gun back to [Brunzo] and I sat back down." Mantich put the barrel of the gun against the back of Thompson's head and shot him once. Mantich stated that he did not want to kill Thompson. Rather, Mantich claimed that he was thinking about himself and was afraid of the others in the van.

At trial, Mantich gave a different account. He testified that he was seated in the back of the van during the entire episode

and only joined the others as they taunted Thompson. Mantich claimed that the members of the gang did not put pressure on him to shoot Thompson and that no one gave him a gun. Mantich testified that during the taunting, he heard a gunshot and saw a spark from the gun. He denied shooting Thompson and speculated that Brunzo had shot Thompson.

Mantich's explanation of the events that directly followed the killing are, for the most part, consistent in his statement to the police and in his testimony in court. Eona stopped the van at about 13th and Jefferson Streets, where Brunzo opened the sliding van door and Eona and Brunzo pulled Thompson's body out of the van. Mantich stated that as the van drove off, he felt a "little thud" and saw the body rolling. Brunzo explained that the van had just run over the body.

The group drove to Carrera's house to retrieve his gun, and Mantich testified that he considered leaving the van at this time, but he did not because he feared that Brunzo or Eona might shoot him if he attempted to do so. The group then drove to the home of Palma's grandmother and proceeded to fire gunshots into the house. Mantich claimed that he did not participate in the drive-by shooting.

The van was then driven to a dock near the South Omaha Bridge and dumped into the Missouri River. The gang members walked back to 13th Street and then split into two groups. Eona handed his gun to Mantich, and Brunzo and Carrera handed their guns to Huerta. After the others left, Huerta and Mantich walked to Huerta's house.

Mantich later left Huerta's house and eventually walked to Brian Dilly's house. When Mantich arrived, he told Dilly, Dilly's two brothers, and a friend of theirs about the events of the evening and stated that he had shot Thompson. Mantich said that if Dilly did not believe him, he should watch the 6 o'clock news. When the news reported the murder, Mantich exclaimed, "I told you so." Dilly testified that after the news report, Mantich retold his account of the events and again stated that he had shot Thompson. Mantich told Dilly that he shot Thompson because Brunzo called him a "puss" and claimed Mantich would not do it.

Dilly testified that Mantich returned about a week later and

told him that other members of the group were angry with Mantich because they had heard someone was talking about their involvement in the killing. The group believed that Mantich was talking about the crime, and Mantich told Dilly that if he found out who was talking, he would kill the person. Dilly assured Mantich that he had not said anything to anyone, and Mantich left.

At trial, Mantich admitted telling Dilly that he had killed the victim, using the words "I pulled the trigger, and I'm a big shot." Mantich said he was trying to impress Dilly and his brothers. Mantich admitted he had returned to Dilly's house, but denied making any threats and claimed that he was merely warning Dilly that the others in the group might kill Dilly and his brothers if they were talking.

Mantich was arrested at Barrientos' house on January 4, 1994, at approximately 9:30 p.m., and he was transported to central police headquarters. At approximately 10:30 p.m, Officer William Jadlowski and Sgt. William Agnew apprised Mantich of the allegations against him and informed him of his *Miranda* rights using the Omaha Police Division's rights advisory form. Mantich verbally waived his right to counsel and agreed to give a statement. During the interrogation, Mantich first claimed that Brunzo fired the shot that killed Thompson. In a later version of the story, Mantich admitted that his first version of the events was not entirely truthful and that he had shot Thompson. Mantich was then asked to give a tape–recorded statement. Upon completion of that statement, the interrogation ended at 2:13 a.m. on January 5.

Mantich moved to suppress the tape–recorded statement on the grounds that it was not given voluntarily. The motion was overruled. The trial court also overruled Mantich's motion to waive jurisdiction and transfer Mantich's case to juvenile court for adjudication. Mantich was tried before a jury and was convicted of murder in the first degree and use of a firearm to commit a felony. Mantich appeals.

## ASSIGNMENTS OF ERROR

Mantich assigns the following errors: (1) The trial court erred in refusing to transfer this case to juvenile court; (2) the court erred in admitting Mantich's tape–recorded statement into

evidence, as the State had failed to prove its voluntariness; (3) the court erred in overruling Mantich's objections to the court's instructions on the law of aiding and abetting and in refusing to instruct the jury as requested by Mantich; (4) the court erred in holding that an unarmed defendant may be convicted as an aider and abettor of using a firearm in the commission of a felony; and (5) the court erred in submitting the case to the jury, as there was insufficient evidence upon which to base a conviction.

## ANALYSIS

### TRANSFER TO JUVENILE COURT

Mantich argues that the trial court erred in refusing to transfer this case to juvenile court. The decision of whether to waive jurisdiction over a juvenile and transfer the case to juvenile court is governed by Neb. Rev. Stat. § 43–261 (Reissue 1993), which provides: "In deciding the motion [to transfer to juvenile court] the court shall, after considering the evidence and the reasons presented by the parties and the matters required to be considered by the county attorney pursuant to section 43–276, transfer the case unless a sound basis exists for retaining jurisdiction." Abuse of discretion is the standard of review applicable to an appeal from a district court's denial of a motion to transfer a pending criminal proceeding to the juvenile court. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990).

The trial court applied factors set forth in Neb. Rev. Stat. § 43–276 (Reissue 1993) to determine whether it should waive jurisdiction and send the case to juvenile court. In *State v. Phinney*, 236 Neb. 76, 459 N.W.2d 200 (1990), we stated that in weighing such factors, there is no arithmetical computation or formula required in the court's consideration of the statutory criteria. In order to retain the proceedings, the court does not need to resolve every factor against the juvenile. There are no weighted factors and no prescribed method by which more or less weight is assigned to each specific factor. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.*

The trial court found that the alleged offense included

violence and was performed in a highly aggressive manner. The motivation for the alleged offense was Mantich's apparent desire to be "upgraded" in the opinion of his peers, and the offense was committed in response to their encouragement. Mantich had previously been involved with the police regarding two property offenses. The court found that Mantich's lifestyle demonstrated a desire to live independently as an adult. He lived with his girl friend frequently and had made his own decision about schooling. The court noted that there were no juvenile facilities appropriate for treatment and rehabilitation of a juvenile who had committed murder. Neb. Rev. Stat. § 43-286 (Reissue 1993) prohibits the placement of juveniles convicted of murder in the Youth Development Center-Kearney. The court found that because of the serious nature of the offense, the security of the public required that Mantich be incarcerated for a period of time extending beyond his minority, which would render the juvenile system inadequate to address these needs.

The trial court held there was a sound basis for retaining jurisdiction and overruled the motion to transfer. We agree. A judicial abuse of discretion exists when the reasons or rulings of a trial court are clearly untenable, unfairly depriving a litigant of a substantial right, and denying a just result in a matter submitted for disposition. See *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995). The court did not abuse its discretion.

### TAPE-RECORDED STATEMENT

Mantich argues the State failed to prove that his tape-recorded statement was voluntary.

> [T]o be admissible in evidence, an accused's statement must be shown by the State to have been freely and voluntarily given and not to have been the product of any promise or inducement—direct or indirect—no matter how slight. . . . [T]he determination of voluntariness is based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made, and the determination made by the trial court . . . will not be disturbed on appeal unless clearly wrong.

*State v. Bronson*, 242 Neb. 931, 937-38, 496 N.W.2d 882, 889 (1993).

This assigned error presents two issues: (1) whether this error was preserved for appeal and (2) whether Mantich's statement was voluntary. The State argues that Mantich did not preserve his challenge to the voluntariness of the statement because he did not enter a proper objection to the statement at trial. We disagree. At trial, Officer Jadlowski discussed the general outline of the interrogation and began to testify about what Mantich stated during the interrogation. Mantich's counsel said, "At this time I'm going to interpose an objection. Renew all objections previously made with regard to my client's statement." The objection was overruled, and the questioning of Jadlowski continued. The State changed the line of questioning to foundation for admission of the statement. The State offered the tape recording, and Mantich's counsel stated, "Objection; foundation." The objection was overruled, and the tape recording was received and played for the jury.

The State argues that Mantich's first objection—renewing his previous objections to admission of the statement, including the grounds he raised in his motion to suppress—did not carry over to preserve an objection when the statement was offered. The State contends that because Mantich's counsel did not specifically state that his second objection was for lack of voluntariness, he failed to preserve this objection to the tape-recorded statement for appeal.

We find that Mantich's general objection on foundation was sufficient to preserve his objection for appeal. Neb. Rev. Stat. § 27-103 (Reissue 1989) provides:

> (1) Error may not be predicated upon a ruling which admits or excludes evidence unless. . . .
>
> (a) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if a specific ground was not apparent from the context . . . .

It would have been reasonably apparent to the trial court that Mantich intended to include an objection to the admissibility of the contents of the tape-recorded statement. Mantich made a proper foundational objection when the statement was offered into evidence. In order for a defendant's statement to be entered into evidence, the State must first prove by a preponderance of

the evidence that the statement was voluntarily made. *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992). The voluntariness of the statement was a foundational issue, which Mantich articulated to the court.

We next consider whether Mantich's tape–recorded statement was voluntary. Mantich argues that the totality of the circumstances surrounding the interrogation demonstrate the involuntary character of the statement. He emphasizes his age, the emotional pressure of the interrogation, and the fact that he did not have his parents or an attorney present at the interrogation. Mantich also claims the officers who interrogated him obtained information by using deceptive practices.

The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession. *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993) (citing *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), and *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985)). In determining whether a confession or statement is voluntary, a court must make its assessment based on an examination of all the circumstances surrounding the confession or statement. See *State v. Johnson*, 242 Neb. 924, 497 N.W.2d 28 (1993). The State bears the burden to prove by a preponderance of the evidence the voluntariness of any statement by a defendant offered into evidence. See *State v. Garza, supra*.

At the suppression hearing, Officer Jadlowski testified that when Mantich was arrested, he was informed that he was being investigated in relation to the homicide of Thompson. The interrogation commenced at 10:30 p.m., and after the officers obtained preliminary biographical information, Mantich was advised of his *Miranda* rights at 10:35 p.m. The officers used a standard rights advisory form, and Jadlowski testified that he recorded each of Mantich's responses to the questions verbatim.

According to Officer Jadlowski, Mantich responded in a coherent manner, was easy to understand, and appeared to understand what was going on. There were no inducements or promises made to Mantich in exchange for his statement. Mantich did not appear to be under the influence of alcohol or drugs at the time he was advised of his rights, and he appeared

to understand what the advisements meant. Jadlowski stated that Mantich was not threatened or coerced. Mantich did not appear to be suffering from any duress under the circumstances and did not request that the interrogation be terminated.

Mantich voluntarily waived his right to counsel being present at the interrogation. Officer Jadlowski testified that Mantich's decision to waive his rights appeared to be intelligently made and that it appeared that Mantich understood what he was doing. After commencement of the interrogation, Mantich did not request to be allowed to consult with an attorney.

Following the advisement of Mantich's rights, Officer Jadlowski informed Mantich that police officers were also interrogating Brunzo, Eona, and Carrera. Jadlowski told Mantich that there was not a lot of mystery as to what had happened and that he believed Mantich was involved in the crime. Jadlowski requested that Mantich explain everything that had happened.

During his first account of the murder, Mantich stated that Brunzo had shot Thompson. The interrogation continued for 1 hour, and the group then took a 30-minute break. At that time, Mantich was allowed to use the restroom, and he was offered a soda, which he accepted. After the break, Officer Jadlowski told Mantich that he had just spoken with Dilly, who said that Mantich had given him a different account of the shooting.

The second segment of the interrogation lasted about 1 hour. In a subsequent account of the killing, Mantich confessed to shooting Thompson. Mantich was asked if he would be willing to make a tape-recorded statement, and he agreed. The group then took a second 30-minute break at approximately 1 a.m. During the break, officers set up the tape-recording equipment. Jadlowski testified that Mantich did not appear to be tired at that time. Mantich then retold the last version of his story for purposes of the tape recording, which took about 43 minutes. After the tape-recorded statement was completed, Mantich asked to call his mother.

Mantich argues that the tape-recorded statement was obtained as a result of the deceptive practices of Officer Jadlowski. At the hearing on the motion to suppress, Jadlowski admitted that he had not spoken to Dilly during the break. In

fact, Jadlowski had received this information from Dilly well before Mantich's interrogation began. The test for determining admissibility of a statement obtained by police deception is whether the deception produced a false or untrustworthy confession or statement. *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986). In this instance, the deception cannot be said to have produced Mantich's statement. The only deception was with regard to the time at which Jadlowski obtained the information from Dilly. The trial court was not clearly wrong in finding that the deceptive statement about the time Jadlowski had spoken to Dilly did not produce an untrustworthy confession.

Mantich argues that the fact that the police taped only 43 minutes of the interrogation, which lasted approximately 2 hours 40 minutes, supports his claim that his confession was coerced. We disagree. A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion. See *id.* We find nothing in the record to indicate that the trial court's findings of fact were clearly erroneous or that the court should have suppressed the tape–recorded statement given by Mantich. At trial, Mantich testified on direct examination that he was never threatened, mistreated, or promised anything by the police officers. Mantich's assignment of error has no merit.

## JURY INSTRUCTIONS AND INTENT

Mantich argues the trial court erred in overruling his objections to the court's instructions on aiding and abetting and by refusing to give his requested instruction. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the

tendered instruction. *State v. Derry*, 248 Neb. 260, 534 N.W.2d 302 (1995).

Mantich claims instruction No. 11 given by the trial court deleted the necessary element of intent from the allegations of aiding and abetting. In *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995), we explained that aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor; however, no particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. We also stated that when a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if it is shown that the aider and abettor knew that the perpetrator of the act possessed the required intent or that the aider and abettor himself or herself possessed such intent.

Intent to kill is not an element of felony murder. *Id.* The intent required is the intent to commit the underlying felony. *Id.*; *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984). Therefore, in order to find Mantich guilty of felony murder, the jury had to find that Mantich possessed the requisite intent to support the underlying felony. In order for the court's jury instructions to be sufficient on the issue of intent in a prosecution for felony murder under an aider and abettor theory, the jury instructions must instruct the jury that the aider and abettor either personally intended that the underlying felony be committed or aided another person whom the aider knew had such an intent. The intent required was not an intent to kill Thompson, but was an intent to commit robbery or kidnapping.

The trial court gave two instructions which, read together, instruct the jury as to the required proof regarding the prosecution's aiding and abetting theory. With respect to the matter of aiding and abetting, the court gave instruction No. 11:

> To be guilty of the crime charged, it is not necessary that the State prove that the defendant himself committed the unlawful act or acts in question.
>
> Whoever aids, abets, or procures another to commit any

offense may be prosecuted and punished as if he were the principal offender.

If you find from the evidence beyond a reasonable doubt that the unlawful act or acts in question were committed by another person who was:

1. Engaged by the defendant to commit the unlawful act or acts; or

2. Engaged with the defendant in a common, concerted, unlawful act or acts; or

3. Incited or encouraged by the defendant to commit the unlawful act or acts,

then the defendant is as guilty as if he himself committed the unlawful act or acts, and it is your duty to find the defendant guilty.

Aiding and abetting involves some participation in the criminal act and must be evidenced by some word, act, or deed. No particular acts are necessary; nor is it necessary that any physical part in the commission of the crime is taken or that there was an express agreement therefor. Mere encouragement or assistance is sufficient.

On the other hand, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving the defendant guilty.

Instruction No. 9 provided:

Criminal intent is a material and necessary element of the crime of Murder in the First Degree in the commission of a felony as charged against the defendant. But the intent required is not an intent to kill Henry Thompson but is an intent to commit a robbery or kidnapping.

The intent required by Instructions 6 and 7 is a material element of the crime charged against the defendant. Intent is a mental process, and it therefore generally remains hidden within the mind where it is conceived. It is rarely —if ever— susceptible of proof by direct evidence. It may, however, be inferred from the words and acts of the defendant and from the facts and circumstances surrounding his conduct. It is for you to determine from all the facts and circumstances in evidence whether or not the defendant committed the acts complained of and

whether at such time he had the criminal intent required by Instructions 6 and 7. If you have any reasonable doubt with respect to either, you must find the defendant not guilty.

If all the jury instructions read together and taken as a whole correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. *State v. Lowe*, 248 Neb. 215, 533 N.W.2d 99 (1995). Instruction No. 11 instructed that Mantich could be found to have committed the underlying felony of robbery or kidnapping as an aider and abettor. Instruction No. 9 specifically stated that the prosecution was required to prove that Mantich intended to commit one of these underlying felonies. Read together, these instructions required the jury to find that Mantich intended to aid and abet the commission of the felony underlying the felony murder charge. Therefore, Mantich was not prejudiced by the use of these instructions instead of the instruction he proffered to the trial court. The court's refusal to give Mantich's proffered instruction was not error.

### USE OF A FIREARM TO COMMIT A FELONY

Mantich argues that the trial court improperly instructed the jury that Mantich could be convicted of the crime of using a firearm to commit a felony under an aider and abettor theory. Instruction No. 7 provided:

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant Douglas M. Mantich of the crime of use of a firearm to commit a felony, as charged in Count II of the Information, are:

1. That on or about the 6th day of December, 1993, in Douglas County, Nebraska, the defendant, Douglas M. Mantich, either alone or while aiding and abetting another person did commit Murder in the First Degree in the perpetration of, or attempt to perpetrate a robbery or kidnapping; which is the subject of Count I of the Information;

2. That in the commission of said Murder in the First Degree in the perpetration of, or attempt to perpetrate a

robbery or kidnapping, a firearm was used; and

3. That such use of a firearm to commit a felony was intentional.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements necessary for conviction.

If you find from the evidence beyond a reasonable doubt that each of the foregoing material elements is true, it is your duty to find the defendant, Douglas M. Mantich guilty of the crime of use of a firearm to commit a felony as charged in Count II and you shall so indicate by completing Verdict Form 3.

On the other hand, if you find the State has failed to prove beyond a reasonable doubt any one or more of the foregoing material elements, it is your duty to find the defendant not guilty of the use of a firearm to commit a felony as charged in Count II and you shall so indicate by completing Verdict Form 4.

The burden of proof is always on the State to prove beyond a reasonable doubt all of the material elements of the crime charged, and this burden never shifts.

Mantich claims instruction No. 7 incorrectly stated that he could be convicted of using a firearm to commit a felony even if the jury believed that he was unarmed.

Use of a firearm to commit a felony is an independent criminal offense under Neb. Rev. Stat. § 28-1205 (Reissue 1989). Nebraska's aider and abettor statute, Neb. Rev. Stat. § 28-206 (Reissue 1989), provides that a person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender. In *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993), we held that one who intentionally aids and abets the commission of a crime may be responsible not only for the intended crime, if it is in fact committed, but also for other crimes which are committed as a natural and probable consequence of the intended criminal act. See, also, *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992); *State v. Trackwell*, 235 Neb. 845, 458 N.W.2d 181 (1990). Thompson was kidnapped, robbed, and terrorized at gunpoint. The crime of using a firearm to commit these acts is a natural and probable consequence of the

kidnapping, robbery, and terrorizing of Thompson. As a natural and probable consequence of the kidnapping and robbery, Mantich—who intentionally aided and abetted these criminal acts—could properly be convicted of using a firearm to commit a felony even if the jury believed that he was unarmed. Mantich's assignment of error has no merit.

### SUFFICIENCY OF THE EVIDENCE

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within a jury's province for disposition. *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995). A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995).

The facts taken in the light most favorable to the State are such that a finder of fact could conclude beyond a reasonable doubt that Mantich committed murder while aiding and abetting in the kidnapping and robbery of Thompson and used a firearm to commit a felony. There is sufficient evidence to demonstrate that Mantich aided and abetted the kidnapping and robbery perpetrated against Thompson. When Eona and Brunzo left the party and returned with the stolen van, Mantich joined them over the strong objections and physical restraint of his girl friend. Mantich testified that he heard Eona and Brunzo tell Thompson they were going to kill him, and Mantich watched as Eona and Brunzo repeatedly jabbed Thompson in the head with the barrels of their guns. Mantich's statement to police was sufficient to establish that he was handed a gun, placed the gun against the back of Thompson's head, and pulled the trigger.

Even if the jury was uncertain as to whether Mantich actually

shot Thompson, the evidence supports the jury's finding that Mantich aided and abetted in the kidnapping and robbery of Thompson. It was undisputed that Thompson was killed by someone in the van while the group was kidnapping, robbing, and terrorizing him. The group forcibly restrained Thompson with the express intent of robbing and terrorizing him. The evidence shows that Mantich encouraged these activities and participated in the verbal terrorization of Thompson. This evidence is sufficient to convict Mantich of felony murder and use of a weapon to commit a felony.

THE SENTENCE

Finally, we address the sentence for use of a firearm to commit a felony. Upon being sentenced to life imprisonment for first degree murder, a defendant is not entitled to credit for time served in custodial detention pending trial and sentence; however, when the defendant receives a sentence consecutive to the life sentence that has a maximum and minimum term, the defendant is entitled to receive credit for time served against the consecutive sentence. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995). We therefore note plain error in Mantich's sentence for use of a firearm to commit a felony.

A sentencing judge is required to separately determine, state, and grant the amount of credit on the defendant's sentence to which the defendant is entitled under Neb. Rev. Stat. § 83-1,106(1) (Reissue 1994). *State v. Marks, supra.* We therefore vacate the sentence imposed for use of a firearm to commit a felony and remand the cause to the trial court with directions to resentence Mantich and give him credit for time served against the firearm conviction.

CONCLUSION

Mantich's convictions for first degree murder and use of a firearm to commit a felony are affirmed. Mantich's sentence for use of a firearm to commit a felony is vacated, and the cause is remanded to the trial court with directions to resentence Mantich, giving him credit for time served.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED WITH DIRECTIONS.

WHITE, C.J., participating on briefs.