STATE OF NEBRASKA, APPELLEE, V. JAMES E. PRICE, APPELLANT.
562 N.W.2d 340

Filed April 24, 1997.   No. S-96-510.

Steven J. Lefler, of Lefler & Franklin Law Office, for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and BOSLAUGH and GRANT, JJ., Retired.

WRIGHT, J.

The appellant, James E. Price, was convicted of felony murder and use of a firearm in the commission of a felony in connection with the death of Curtis Patterson. Price was sentenced to life imprisonment for the felony murder and 5 to 10 years' imprisonment for the use of a firearm in the commission of a felony.

## SCOPE OF REVIEW

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

## FACTS

On July 22, 1995, Patterson and Melvin Walton drove to the home of Jobina Lloyd. Patterson remained in the car while Walton went to the door. As Walton stood on the porch, a van pulled into the driveway behind Walton's car. There were eight men in the van, including Tim Badgett, Matthew Lathan, Daron

Hunter, Vincent Peavy, Demetrius Gibbs, Terril Martin, Kenneth Martin, and Price. Lathan was driving the van, which he parked in such a manner that Walton's car could not be backed out of the driveway.

Walton testified that five men jumped out of the van, each displaying a gun. One of the men forced Patterson out of Walton's car and into the van by placing a gun to his head. One of the men told Patterson that if he "didn't shut up he was going to kill him right there." Witnesses identified Hunter as the man who forced Patterson from the car at gunpoint. After Patterson was forced into the van, two men jumped into Walton's car.

Lloyd testified that one of the men stood in the street in front of her house, holding what looked like a shotgun. This man yelled at the people on the porch to go into the house and shut the door. Other witnesses identified this man as Price and stated that he was carrying an AR-15 rifle. The driver of Walton's car pointed a gun at Walton and told him to get back on the porch. Walton was not able to identify any of the five men because they all had some form of mask covering their faces. Hunter and Terril Martin identified Price as the driver of Walton's car.

Hunter followed Patterson into the van and held a small pistol in his lap. Kenneth Martin sat at the back of the van behind Patterson and also displayed a gun. Gibbs testified that Kenneth Martin pushed and bullied Patterson and told him that he might lose his life.

Evidently, the group decided to take Patterson to a dirt road near 49th and Kansas Streets. Price and Terril Martin followed the van in Walton's car. When the van and the car reached the dirt road, the people in the van jumped out. The group then took boxes, a stereo, and other items from the car.

At that point, Patterson was forced to lie on his stomach between the two vehicles. Price stood over Patterson with his rifle pointed at Patterson. Hunter demanded that Patterson tell him where Hunter's property was and who had stolen the property. Hunter kicked Patterson in the leg and kicked dirt on him. Others, including Price, then began kicking Patterson.

After they finished removing things from Walton's car, the group could not get the van started, and several members began to walk away from the scene. Gibbs stated that he had started to

walk toward Badgett's house when he heard a gunshot. He looked back and saw Price standing 10 to 12 feet from the car and holding a gun. Later, Gibbs saw Price and Terril Martin crossing a field, and he asked Price if they had killed Patterson. Price stated he thought he had killed Patterson, because when he knocked on the trunk, Patterson did not say anything.

Badgett testified that Hunter and Price placed Patterson in the trunk of the car and that Badgett subsequently heard a shot come from Price's gun. When Badgett looked back, he saw Price's gun pointing at the car. According to Badgett, Gibbs arrived at Badgett's house within 5 or 10 minutes and informed him that Patterson was dead. About 10 minutes later, Price and Hunter arrived at Badgett's house. When Hunter asked Price "why he did that," Price responded that he did it because "[h]e thought [Hunter] wanted him dead." Badgett stated that Price then began handing out money and that "he asked us what was wrong with us? Hadn't we ever killed anybody?"

Hunter testified that at the scene of the shooting, Patterson got out of the van, and someone told him to get on the ground. Patterson then lay on the ground while some members of the group kicked him and kicked dirt onto him. Hunter stated that the group was trying to scare Patterson so that he would comply with Hunter's demand to tell him where Hunter's property was located. While this occurred, Price was still displaying the AR-15 rifle. Patterson told the group he would take them to Hunter's property and pled with them not to hurt him. Hunter stated that he believed Patterson would have taken the group to Hunter's property. However, Price told the members of the group that they could not be seen driving through the neighborhood with Patterson and insisted that Patterson be put in the trunk of the car. At that time, Price had the keys to the car. He opened the trunk, and Patterson climbed in.

Hunter testified that after Patterson climbed into the trunk, he got into the driver's seat and began backing the car to turn it around. Terril Martin was in the front passenger's seat, and no one else was near the car. Hunter was talking to Patterson, when he heard a gunshot on his side of the car. He then saw Price standing behind the car with the rifle. After the gunshot, Patterson did not speak again.

After driving the car to his grandmother's house, Hunter found a bullet hole in the trunk. He then drove to a location near a schoolyard, where he found Price. Hunter testified that he confronted Price and told him that Patterson "didn't deserve to die like that. Over some stupid shit." Hunter testified that Price replied, "Fuck it. It's over with." Price then discussed taking the car to Glen Cunningham Lake to get rid of it. Price got into the car with some other members of the group and left. Hunter and Lathan left in Hunter's car, and eventually, Hunter went to another house, where he found the others. At that point, Price told Hunter that he had placed the car behind an apartment complex and that he had set the car on fire.

A jury found Price guilty of felony murder and use of a firearm in the commission of a felony. He was sentenced to life imprisonment for the felony murder and 5 to 10 years' imprisonment for the use of a firearm in the commission of a felony.

## ASSIGNMENTS OF ERROR

Price assigns the following errors: (1) The trial court erred when it prevented Price from participating effectively in his own defense by ordering him to remain in a security belt during the trial; (2) the court erred when it answered a question directed at a witness during cross-examination by defense counsel; (3) the court erred when it permitted the prosecution to present evidence that was highly prejudicial and not relevant; (4) the court erred when it impaneled a jury that was less than 5 percent African-American, thereby denying Price a trial by a jury of his peers; (5) the court erred when it did not give jury instructions on second degree murder, manslaughter, kidnapping, or robbery alone; (6) the court erred when it allowed co-perpetrators to testify after they had invoked the Fifth Amendment privilege at their depositions, thereby denying Price's Sixth Amendment right to confront witnesses; and (7) the evidence was insufficient to support the convictions.

## ANALYSIS

### SECURITY BELT

Price alleges that the trial court prevented him from participating effectively in his own defense by ordering him to remain in a security belt during the trial. The security belt allegedly

would produce an electric shock if the judge or a member of the sheriff's department so ordered. Price claims the threat of this shock restricted his ability to participate in his own defense.

We do not address this assignment of error because there is no evidence in the record that Price was required to wear a security belt during the trial. In reviewing the decision of a lower court, an appellate court considers only evidence included within the record. *State v. Trackwell*, 250 Neb. 46, 547 N.W.2d 471 (1996). It is incumbent upon the appellant to present a record which supports the errors assigned; absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed. *Id.*

### Statement by Trial Court

Price argues that the trial judge erred when he answered a question directed at a witness during cross-examination by defense counsel. During cross-examination, Badgett was asked if he knew whether his testimony would determine what his sentence would be. Badgett responded "no." The judge stated: "I can assure — That question's improper. I can assure you he does not know. Nobody knows. I don't even know."

Price's counsel requested a mistrial, arguing that the judge's response to the question had improperly tainted the jury. The request for a mistrial was overruled. In his brief, Price argues that the judge's comments in the presence of the jury were clearly prejudicial and invaded the province of the jury by interposing an opinion and answering a question directed toward a witness.

In *State v. Rodriguez*, 244 Neb. 707, 709, 509 N.W.2d 1, 3 (1993), this court found prejudicial error when the trial judge, in response to defense counsel's claim that a police officer sitting at the prosecution table was coaching a testifying witness, stated: " 'No, he wasn't. I was watching him.' " We held that an appellate court must examine the particular circumstances of the case to determine whether the judge's behavior was so prejudicial to the substantial rights of the party as to merit a reversal.

In *Rodriguez*, the witness' credibility was crucial. He was the only witness who could connect Rodriguez to the crime. Cross-examination of the witness was essential to discredit him.

During cross-examination, the defense claimed that the police officer was coaching the witness. The judge flatly stated that no coaching had occurred. We found under these circumstances that the judge's comments had prejudiced Rodriguez' case because the comments bolstered the credibility of the prosecution's only witness.

In the present case, however, the judge's statement did nothing to enhance the credibility of Badgett as a witness. Badgett had made a "deal" regarding his sentence in exchange for his testimony. He testified that he did not know whether his testimony would determine what his sentence would be, and the judge concluded that such a question was improper. Further comment by the judge was unnecessary and should not have been made, but under these circumstances, such comments were clearly not prejudicial to Price. The court was merely stating that this was a matter for the court to decide.

### EVIDENCE OF FLIGHT

Price argues that the trial court erred by allowing evidence that he left Omaha prior to the issuance of a warrant for his arrest. Price claims that the prejudicial effect of this evidence outweighed its probative value and that it should have been excluded pursuant to Neb. Rev. Stat. § 27-403 (Reissue 1995). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Lee*, 247 Neb. 83, 525 N.W.2d 179 (1994). Price argues that the fact that he left Omaha had no probative value because he returned to Omaha voluntarily prior to his arrest.

The record established that Price, Hunter, and Kenneth Martin went to Lincoln shortly after the murder of Patterson and remained there for about a week. The three then traveled to North Carolina. A jury may consider evidence of a person's voluntary flight soon after the occurrence of a crime as evidence of a person's guilt. See *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993). We find this assignment of error to be without merit.

### JURY OF PEERS

Price argues that he was denied a trial by a jury of his peers because the venire panel and the jury included only one African-American. In *State v. Jones*, 246 Neb. 673, 522 N.W.2d

414 (1994), we held that in order to establish a prima facie case of a violation of the Sixth Amendment right to a jury pool representing a fair cross section of the community, the defendant must show the following: (1) The group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Price has failed to establish that the representation of African-Americans in venires from which Douglas County juries are selected is unfair and unreasonable in relation to the number of such persons in the community. Price admits that such selections are made randomly by computer. Cf. *State v. Jones, supra.*

Price claims the State systematically excludes African-Americans from the jury selection process by asking whether a potential juror is so strongly opposed to the death penalty that he or she could not be fair or impartial. As a preliminary matter, Price has not presented any evidence substantiating his claim that African-Americans and non-African-Americans have divergent views on capital punishment. Nonetheless, even if Price had presented such evidence, it would not advance his argument that the venire panel was corrupt under *Jones. Jones* prohibits the systematic exclusion of distinctive groups based upon the racial, religious, gender, or ethnic identity of that group relative to the balance of the community. By definition, the exclusion of persons from a venire panel on the basis that they oppose the death penalty in principle is an exclusion which has nothing to do with their racial identity. Accordingly, *Jones* is not implicated.

Moreover, we have consistently held that exclusion of a person from a first degree murder venire panel is permitted on the basis that potential jurors are opposed to the application of the death penalty. See, *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987); *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985). This assignment of error is without merit.

## INSTRUCTIONS ON LESSER-INCLUDED OFFENSES

Price argues that the trial court erred by not giving jury instructions on second degree murder, manslaughter, kidnapping, or robbery alone, as requested by Price. During the trial, Price's counsel presented evidence which indicated that Price did not plan or intend to kidnap Patterson. Based on this evidence, Price argues that he was entitled to an instruction on second degree murder and manslaughter because these crimes are lesser-included offenses of felony murder.

In Nebraska, there are no lesser-included offenses to the crime of felony murder. See *State v. Masters*, 246 Neb. 1018, 524 N.W.2d 342 (1994). When an information charges a defendant with felony murder, it charges only murder in the first degree; it is error for the trial court to instruct the jury that it may find the defendant guilty of second degree murder or guilty of manslaughter. *Id.*

In his supplemental brief, Price relies on *Reeves v. Hopkins*, 102 F.3d 977 (8th Cir. 1996). In that case, the Eighth Circuit found that the refusal of Reeves' proposed instructions on second degree murder and manslaughter violated *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).

We find that *Reeves* is inapplicable to the case at bar. As noted by the Eighth Circuit in *Reeves*, in Nebraska, the critical difference between felony murder and first degree murder is that the underlying felony takes the place of the intent to kill or premeditated malice, and the purpose to kill is conclusively presumed from the criminal intent required for the underlying felony. *Reeves* found nothing "necessarily unconstitutional" with the definition of mental culpability required in Nebraska for a felony murder conviction. 102 F.3d at 984. However, the Eighth Circuit concluded that "the State may not, consistent with the Constitution, bar an instruction on noncapital homicide, in a felony murder case where the death sentence is imposed, on the basis that felony murder requires no showing of intent or, at least, a reckless indifference to the value of human life." *Id.*

In *Reeves*, the court limited its opinion to those felony murder cases where the defendant is subsequently sentenced to death. Since Price was not sentenced to death, *Reeves* clearly

does not apply, and we decline to extend any relief to Price on the basis of *Reeves*.

## TESTIMONY BY COPERPETRATORS

Price argues that the trial court erred by allowing his coperpetrators to testify after they had invoked the Fifth Amendment at their depositions. He argues that the witnesses' refusal to testify at their depositions violated his right to confrontation under the Sixth Amendment.

In *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995), two codefendants invoked their Fifth Amendment privilege against self-incrimination at their scheduled depositions prior to Brunzo's trial. Brunzo argued that because the court did not compel the two witnesses to present themselves to be deposed, the court incorrectly permitted such witnesses to testify at trial. We held that under the circumstances, the fact that the witnesses had invoked the privilege against self-incrimination at their scheduled depositions did not mean that the State could not call them as witnesses at trial once they elected to testify.

Here, Price does not effectively articulate how his Sixth Amendment rights were infringed upon under the circumstances. Price does not establish how his right to confront and cross-examine these witnesses was denied him at trial, and Price does not state how prior knowledge of the witnesses' trial testimony would have assisted in the preparation of his defense. Price's counsel knew in advance that the coperpetrators would testify and had received a copy of each individual's taped statement. Price also had a copy of the police officers' narrative reports of their interviews with each of the coperpetrators. Also, when Price learned that the witnesses would testify at trial, he did not move for a continuance in order to depose them. Price does not claim that he was prevented from cross-examining these witnesses at trial or that the witnesses refused to testify during cross-examination. We find this assignment of error to be without merit.

## SUFFICIENCY OF EVIDENCE

Price argues that the evidence presented was insufficient to support his convictions. On review, a criminal conviction must be sustained if the evidence, viewed and construed most favor-

ably to the State, is sufficient to support the conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

Price points to inconsistencies in his coperpetrators' descriptions of what happened. However, the facts, taken in the light most favorable to the State, are sufficient for a finder of fact to conclude beyond a reasonable doubt that Price participated in Patterson's kidnapping and that Patterson was killed during the kidnapping.

Walton testified that as he stood on the porch of Lloyd's house, the van in which Price was riding pulled up behind his car. The van was parked in such a manner that there was no way his car could have been backed out of the driveway. Walton then saw five men jump out of the van. One of the men approached Walton's car and forced Patterson out of the car and into the van while holding a gun to his head. After Patterson was forced into the van, two of the men jumped into Walton's car. The group then drove away with Patterson in the van, and the two men took Walton's car and followed the van. Hunter and Terril Martin testified that Price was the driver of Walton's car.

When the group reached a dirt road near 49th and Kansas Streets, Patterson got out of the van and was instructed to lie on his stomach between the van and Walton's car. Price stood over Patterson with an AR-15 rifle pointed at him while the others in the group kicked Patterson, attempting to scare him. Patterson then submitted to Hunter's demand that he take the group to recover Hunter's property. At that point, Price told the others to put Patterson in the trunk of the car. Whether Patterson voluntarily climbed into the trunk or was forced into it is not determinative. Price, who was armed with a rifle, demanded that Patterson get into the trunk, and Patterson complied.

There is evidence that once Patterson was in the trunk, Price fired a shot into the trunk, and that Price believed Patterson was dead because he did not hear Patterson when he knocked on the trunk. There is also evidence that Price admitted killing

Patterson. After the group determined that Patterson was in fact dead, Price participated in a discussion regarding the need to get rid of the car, and Price set the car on fire.

There is also evidence that Price participated in the robbery which resulted in Patterson's death. While Hunter forcibly removed Patterson from Walton's car, Price stood in front of Lloyd's house armed with an AR-15 rifle and repeatedly instructed Walton to stay on the porch. After Hunter removed Patterson from Walton's car, Price got into the car and took it from the scene. This is sufficient evidence from which a jury could find beyond a reasonable doubt that Price committed robbery against Walton.

From the evidence described above as to the underlying felonies of kidnapping and robbery, there is also sufficient evidence to support Price's conviction for use of a firearm to commit a felony.

## CONCLUSION

For the reasons set forth herein, we affirm the judgments of conviction and sentences of the district court.

AFFIRMED.