STATE OF NEBRASKA, APPELLEE,
v. LAMONT E. ARNOLD, APPELLANT.
572 N.W. 2d 74

Filed January 16, 1998.    No. S-96-1332.

Anthony S. Troia for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

In accordance with the verdict, the district court adjudged the defendant-appellant, LaMont E. Arnold, guilty on two counts of murder in the first degree, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1995), and two counts of using a deadly weapon in the commission of a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1995). Because he was sentenced to life imprisonment on each of the murder convictions, Arnold's appeal was docketed directly in this court as provided by Neb. Rev. Stat. § 24-1106 (Reissue 1995). He asserts, in summary, that the district court erred in (1) finding the evidence sufficient to support the charges and (2) denying his motion to investigate possible juror misconduct. We affirm.

## I. FACTS

Two related homicides took place late on the night of Saturday, September 23, 1995, or during the early morning hours of Sunday, September 24. First, the Omaha police found the body of Louis Clinchers lying on a concrete walkway. He had suffered multiple stab wounds to his upper chest and abdomen, a stab wound in his left arm, a stab wound to his left eye, trauma to his head, and various bruises and abrasions. His "left rear pocket" had been turned inside out.

Not more than three blocks away, the police next found the body of Shawn Nelson in the kitchen of his apartment. They immediately detected the odor of Mace and noticed that items in the apartment were knocked over and broken. Nelson had suffered stab wounds to his torso and back.

Theresa Newberry testified that she and Jennifer Grabenschroer had gone to the house of Rick Larsen and Jason Landers in the late afternoon of the day of the murders. Later that evening, more people began to appear at Larsen's house. Newberry, Grabenschroer, Larsen, and Landers left the house to do laundry and to eat. By the time they returned, approximately 40 people were gathered at Larsen's house. Newberry testified that she saw Arnold at the party and that he appeared to be very intoxicated. She heard Arnold telling Larsen and Landers, while screaming, yelling, and cursing, that he had been "jumped" earlier that day and that the assailants had cut his face. Grabenschroer also heard Larsen, Landers, and Arnold say that

they were going to "jump" some people who earlier had assaulted Arnold. When the police contacted Arnold on September 28, he had an abrasion on the left side of his chin.

Approximately 20 minutes elapsed between the time Arnold and Larsen left the house and then returned, at which time Newberry and Grabenschroer saw Larsen holding a bloody knife and heard him say that he had just "killed somebody." According to Newberry, Larsen carried a knife with him the entire evening. Arnold was standing with Larsen in the hallway, but said nothing. Newberry then heard Larsen and Arnold talking about "[g]oing to get the other dude." As Newberry and Grabenschroer were leaving Larsen's house, Arnold asked for and was given Grabenschroer's Mace. At this point, Arnold said to Newberry that he had personally "bricked" the first victim, later identified as Clinchers, and "beat him up pretty bad." Arnold also told Newberry that Larsen did the stabbing. Newberry and Grabenschroer then left Larsen's house.

Jeff Briney also was at Larsen's house on the night of the murders. Briney testified that Arnold left the party alone and returned upset because he had been jumped and cut on the face by some white men using racial slurs. According to Briney, Arnold and one Eric left the party, and when they returned, Eric stated that he personally beat Clinchers. Larsen then said, "[L]et's go finish him off."

Next, according to Briney, he, Larsen, and Arnold went to find Clinchers. When they arrived, Clinchers was lying on the ground, bleeding from the head and mouth and making gurgling sounds as if choking on something. Briney testified that Arnold watched as Briney kicked and Larsen stabbed Clinchers. Arnold then took a pack of cigarettes from Clinchers' pocket. Because Clinchers was still making sounds, Larsen resumed stabbing him. After the three returned to the Larsen party, Larsen bragged about the killing. According to Briney, Arnold and Larsen asked everybody at Larsen's party where Nelson, the other man who had jumped Arnold, was, and eventually someone told them. Arnold, Briney, Landers, and Larsen then left the party and headed for a nearby apartment complex.

According to Briney, when they arrived at the apartment complex, Arnold hopped into a window well, opened the win-

dow with a knife, and entered an apartment. He was followed by the other three. Two men were present in the living room. Arnold, with his shirt pulled over his head, walked into the living room and began spraying Mace. According to Briney, Nelson hit Arnold, knocking him to the floor; the two continued fighting near the kitchen. After Briney finished fighting with the apartment's other occupant, he saw Arnold and Larsen leave the kitchen; however, Larsen returned with a 2 by 4 and hit Nelson with it.

Briney had reported to the police that upon their return to Larsen's house, Arnold had the knife in his hand, along with his shirt, and was "ditching" the knife before reentering the house; however, at trial Briney testified that Arnold did not have the knife with him as they were walking back to Larsen's house. While Briney stated that he remembered more details about the murder when he spoke to the police earlier, he testified that some of his statements to the police were "told out of fear." Briney testified that before reentering Larsen's house, Arnold hesitated for a moment, took off his shirt, and threw it.

Newberry and Grabenschroer returned to Larsen's house and picked up Arnold after the murders. As Newberry and Grabenschroer were driving Arnold from Larsen's house, Arnold took off his pants, handed them to Newberry, and told her to throw them out the window, which she did. According to Newberry, after arriving at her house, Arnold, laughing and giggling, related that he and the others had handled the situation. According to Grabenschroer, Arnold said that he had killed Nelson in the apartment with a knife. After Arnold left Newberry's house, Larsen and Landers arrived.

Larsen told Newberry that "they," meaning Arnold and Larsen, had beat up Clinchers, but that Larsen personally did the stabbing. As for Nelson, Larsen told Newberry that he had intended to kill him, but that Arnold took the knife. More specifically, Larsen told Newberry that at the Nelson murder scene, Arnold "grabbed the knife out of his hand and was, like, fuck that, he cut my face . . . ." Grabenschroer recalls Larsen saying that he killed Clinchers and that Arnold killed Nelson.

Dr. Jerry Wilson Jones, a pathologist, testified that Clinchers suffered multiple injuries to the head produced by blunt trauma,

and sharp-force injuries produced by a knife. Clinchers' blunt-force head injuries included a large laceration in the right temple associated with a skull fracture which extended into the base of the skull, a diffuse scalp hemorrhage on the left side of the scalp, a small amount of hemorrhage over the surface of the brain, and extensive bruising of the left side of the brain. There was a large laceration of the right temple and fracture of the skull, which are consistent with blunt-force trauma. In Jones' opinion, this laceration was not caused by a knife. Jones testified that Clinchers' head injuries were consistent with being hit in the head with a brick or large rock.

Clinchers suffered a total of 20 stab wounds, including wounds penetrating through his left upper eyelid and right lower eyelid; three wounds of the skin and cartilage of the right ear; four wounds in the right side of the neck penetrating the soft tissue, larynx, trachea, thyroid gland, and carotid artery; two wounds penetrating the front left side of the chest wall into the lung and heart; one wound penetrating the center chest into the sternum; four wounds penetrating the front right side of the chest into the liver; and four wounds penetrating the back right side of the chest into the lung and heart.

Jones testified that Clinchers was alive at the time he received all of his injuries and that the multiple stab wounds to the face, neck, and chest killed him. However, Jones testified that Clinchers' head injuries were very serious and potentially fatal and that Clinchers would likely have died from the head injuries alone had the stab wounds not occurred.

Jones testified that Nelson suffered 17 separate stab wounds and some blunt-force injuries. According to Jones, Nelson died of multiple stab wounds to the scalp, neck, chest, shoulder, and axillary areas.

## II. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

We consider Arnold's claim in the first assignment of error, that the district court erred in finding the evidence sufficient to sustain the charges, under the rule that on review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the

conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within a jury's province for disposition. *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997); *State v. Price*, 252 Neb. 365, 562 N.W.2d 340 (1997).

Under the provisions of § 28-303, a person commits murder in the first degree if he or she kills another person purposely and with deliberate and premeditated malice, and such a killing is a felony. According to § 28-1205, a person commits the offense of using a deadly weapon to commit a felony if he or she uses or possesses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state. Neb. Rev. Stat. § 28-206 (Reissue 1995) provides that a "person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender."

Aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor; however, no particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996); *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995). When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if it is shown that the aider and abettor knew that the perpetrator of the act possessed the required intent or that the aider and abettor himself or herself possessed such intent. *Mantich, supra*; *Brunzo, supra*. But evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving a defendant guilty under an aiding and abetting theory. *State v. Trackwell*, 235 Neb. 845, 458 N.W.2d 181 (1990); *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989), *cert. denied* 498 U.S. 881, 111 S. Ct. 216, 112 L. Ed. 2d 176 (1990).

With regard to the counts associated with the murder of Clinchers, there is evidence that Arnold stated that he was going

to "jump" some people who had assaulted him earlier; that Arnold admitted he personally "bricked" and beat Clinchers; and that Clinchers suffered very serious and potentially fatal blunt-force head injuries consistent with being hit in the head with a brick or large rock, including a large laceration in the right temple associated with a skull fracture which extended into the base of the skull, a diffuse scalp hemorrhage on the left side of the scalp, a small amount of hemorrhage over the surface of the brain, and extensive bruising of the left side of the brain. In addition, there is evidence that Arnold escorted Larsen, who had expressed a desire to "finish [Clinchers] off," and Briney to where Clinchers was lying, still bleeding from the head and mouth, and that Larsen then stabbed Clinchers 20 times. According to the pathologist, although the stab wounds killed Clinchers, had he not been stabbed, he would likely have died from the head injuries.

With regard to the counts associated with the murder of Nelson, there is evidence that after Clinchers' murder, Arnold discussed "[g]oing to get the other dude"; that Arnold asked for and was given Grabenschroer's Mace; that Larsen and Arnold asked people at Larsen's party where Nelson could be found; that after learning where Nelson was, Arnold and others left Larsen's house and headed for a nearby apartment complex; that Arnold jumped into a particular window well at the apartment complex, opened the window with a knife, and entered the apartment; that after Arnold sprayed Mace in the apartment's living room, Arnold and Nelson began fighting near the kitchen; and that after the fighting had ended, Arnold was seen leaving the kitchen. In addition, Arnold admitted that he killed the victim in the apartment with a knife. Moreover, while Larsen admitted stabbing Clinchers, Larsen also stated that Arnold stabbed Nelson, who died as a result of being stabbed 17 times.

Thus, the evidence is such that the jury could find beyond a reasonable doubt that Arnold personally used a deadly weapon to kill both Clinchers and Nelson or that if he did not do so personally, he aided and abetted others in doing so. The first assignment of error is therefore meritless.

## 2. JURY MISCONDUCT

In the second assignment of error, Arnold contends that the district court erred in overruling his motion to investigate possible jury misconduct. This assignment presents a question of law, in connection with which we, as an appellate court, are obligated to reach a conclusion independent of the determination reached by the court below. See *State v. Williams, ante* p. 111, 568 N.W.2d 246 (1997).

Early in the trial, a member of Arnold's defense team noticed two jurors conversing. This occurred after the district court denied the State leave to "publish," that is, as we understand the record, to immediately display to each juror, two photographs depicting Clinchers' bloody body which the court had received over Arnold's objection. According to one of the team members, after the district court had ruled that the photographs would not be published, a juror leaned over to another juror, poked the latter and "kind of like made a real kind of disgusted look and pointed over" to the defense team, and "wiggled a finger, pointing" at the team, at which time the latter juror "just did kind of a nice — kind of like, yeah, uh-huh." Later, "she again looked over at her and like shook her head and said something again, pointed over" to the defense team. The defense unsuccessfully moved to question at least one of the jurors to determine whether there had been any conduct prejudicial to Arnold.

We have held that when an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur or that it was not prejudicial, adequate findings are to be made so that the determination may be reviewed. *State v. Nissen,* 252 Neb. 51, 560 N.W.2d 157 (1997); *Hunt v. Methodist Hosp.,* 240 Neb. 838, 485 N.W.2d 737 (1992); *State v. Steinmark,* 201 Neb. 200, 266 N.W.2d 751 (1978).

In *Hunt,* juror affidavits established that presubmission discussions took place at which jurors discussed the probable out-

come of the case. We remanded the cause for a hearing to determine what was said during those discussions and whether the discussions resulted in prejudice to the plaintiff. In *Steinmark*, a juror affidavit alleged that during deliberations, jurors repeated rumors they had heard about the defendant and had drawn improper conclusions regarding specific pieces of evidence. We remanded the cause for a further hearing upon the matter of misconduct.

But unlike the situation in *Hunt* and *Steinmark*, here the showing does nothing more than establish that a juror may have momentarily reacted to a courtroom occurrence. Under such a circumstance, it cannot be said the district court abused its discretion in implicitly finding that the showing did not rise to the level of tending to prove serious misconduct. The second assignment of error is therefore also without merit.

## III. CONCLUSION

There being no merit to either of Arnold's assignments of error, the judgment of the district court is affirmed.

AFFIRMED.

CAPORALE, J., dissenting.

While I agree that the evidence supports Arnold's convictions, I must nonetheless dissent, for the district court abused its discretion in not investigating the jury conduct Arnold described, and thus clearly erred.

Quoting *State v. Washington*, 182 Conn. 419, 438 A.2d 1144 (1980), we acknowledged in *Hunt v. Methodist Hosp.*, 240 Neb. 838, 846, 485 N.W.2d 737, 743 (1992), the seriousness of pre-deliberation discussions by noting:

> Derived from the constitutional concept of a right to a jury trial is the principle that "it is improper for jurors to discuss a case among themselves until all the evidence has been presented, counsel have made final arguments, and the case has been submitted to them after final instructions by the trial court."

"As confirmed by case law, the constitutional right in both civil and criminal cases protects parties from juror discussions prior to deliberations. *Anything short of silence is juror misconduct*, and at some point, nondeliberation dialogue prejudices a

party and voids the trial." (Emphasis supplied.) *Id.* at 848, 485 N.W.2d at 744.

The situation described by Arnold is not one in which a juror, without engaging anyone else in conversation, shakes or nods the head, rolls the eyes, smiles, laughs, yawns, or demonstrates any other individual response to what has been heard, seen, or otherwise sensed. Rather, it is a situation in which a juror spoke words to another juror under circumstances which at least suggest that the conversation related to something that had transpired in the courtroom, and which further suggest that displeasure was being directed at the defense team. Indeed, the district court acknowledged as much by observing that "[c]learly, they want to see something right now . . . [b]ut, anyway, I am not going to explore it any further . . . ." I therefore submit that Arnold met his burden of making a showing tending to prove that serious misconduct had occurred.

Surely, if one juror said to another that it was obvious that Arnold's team was trying to hide something and for that reason could never vote to acquit Arnold, we would hold that serious jury misconduct had taken place and that Arnold had been prejudiced. However, since the majority chooses to approve the district court's election to remain ignorant, we will never know what was said or whether Arnold was prejudiced.

I would remand the cause to the district court with the direction that it conduct a hearing to determine what was said and whether what was said prejudiced Arnold.

GERRARD, J., joins in this dissent.