STATE OF NEBRASKA, APPELLEE, V.
JOHN D. RAMSAY, APPELLANT.
598 N.W.2d 51

Filed August 6, 1999.   No. S-98-1092.

Toney J. Redman for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Following a jury trial in the district court for Lancaster County, John D. Ramsay was acquitted of aiding and abetting the use of a weapon to commit a felony but convicted of aiding and abetting the unlawful discharge of a firearm. He was sentenced to incarceration for a period of 7 to 10 years and commenced this direct appeal. We reverse, and remand with direction to dismiss because we conclude that the evidence is insufficient as a matter of law to support the conviction.

## FACTS

At approximately 2:35 a.m. on December 20, 1997, police were dispatched to a residence at 2945 Starr Street in Lincoln, Nebraska, regarding a reported shooting. According to witnesses at the scene, shots were fired through the front window of the residence from the outside, and Frankie L. Rhodes, who was inside the house, was struck by gunfire. Rhodes subsequently died.

The residence was owned by Clyde James and Dietra Wilkinson. At trial, James testified that both Maurice "Fleet" Miley and Ramsay were present at the residence between approximately 1 and 1:30 a.m. on December 20. According to James, an argument began between Cedric Jones and an unidentified individual in a room where several partygoers were gambling. After some discussion, James told Jones to leave, and Jones and Miley left the residence together. When they returned approximately 15 minutes later, Jones entered the residence but Miley was detained at the entryway, where he became involved in an argument with Dietra Wilkinson, and James asked him to leave. At that point, unidentified persons pushed Miley out of the residence and did not permit him to reenter. Jones, who had observed at least some of the argument, left at the same time. A few minutes later, Miley reappeared outside the doorway, where he remained for a few minutes and then left after stating his intention to return. James did not see Ramsay leave with Miley but knew that Ramsay was not in the residence after Miley left. Jones eventually returned to the residence and was present when the shooting occurred.

Dana Wilkinson, the niece of Dietra Wilkinson, testified that she arrived at a party at the residence during the early morning hours of December 20. Instead of traveling on the main streets, Dana Wilkinson drove through an alley and parked her vehicle in an area south of the residence. She entered the residence, as did all the other partygoers, through sliding glass doors located on its north side.

While present at the party, Dana Wilkinson saw Miley, whom she recognized as a friend of Jones'. She noticed Miley arguing with Dietra Wilkinson and James, heard Dietra Wilkinson call for Jones, and then saw Miley and Jones walk outside. She left the party approximately 10 to 20 minutes later, and as she walked south on the sidewalk leading toward the alley and her car, she encountered Miley walking toward her. They met near the front window of the residence. Miley was wearing a black ski mask that covered his face, but Dana recognized him because his dreadlocks were arranged in a ponytail and the mask did not fully cover his hair. When she asked him why he was wearing the mask, Miley pointed a firearm at her. She then observed Miley point the firearm at the window of the residence and begin firing. Afraid for her safety, Dana Wilkinson ran to the area where her car was parked and hid behind some garbage cans. While in hiding, she heard footsteps running along the sidewalk and the closing of a car door and then saw a vehicle speed down the alley, kicking up rocks and dust from its tires. Dana Wilkinson identified the vehicle as a dark-colored, four-door Honda with tinted windows. She did not know Ramsay and did not see him at the party, but admitted that it was possible he was at the party and that she did not see him there.

Andre W. Huffman testified that he was about to enter the party when he saw someone shooting into the window. He recognized the shooter as a person he had seen at a party the week before. Huffman later identified Miley as the shooter from a photograph array shown to him by police. Huffman did not know Ramsay and did not see him on the night of the shooting.

Lincoln police officer Sandra L. Myers testified on direct examination that she showed the photograph array to Huffman and generally described this process. On cross-examination, Ramsay's trial counsel asked Myers whether she had talked to

anyone who had "firsthand knowledge of John Ramsay participating in this crime." Myers responded that Jones told her that about 10 minutes prior to the shooting, he saw Ramsay get in the driver's seat and Miley get in the passenger seat of a car when they left the residence. Jones told Myers that he then reentered the residence and was present when the shots were fired. Myers admitted on cross-examination that Jones did not report hearing Ramsay and Miley discussing a shooting or any other unlawful activity.

Dawn Wimes testified that she owned a brown 1989 four-door Honda Accord in December 1997. At that time, she was dating Ramsay's brother, who had borrowed the vehicle at about 5:30 p.m. on December 19. She testified that other members of the Ramsay family frequently used the vehicle. Wimes further testified that on the morning of December 20, she awoke to find both Ramsay and Miley asleep on couches in her living room, which did not seem unusual to her because both men had previously spent the night at her residence.

The trial was interrupted for a hearing outside the presence of the jury on the voluntariness of a statement given by Ramsay to police on December 20, 1997, prior to Ramsay's becoming a suspect in the investigation of the shooting. On cross-examination of Officer James J. Spanel, who had taken the statement, Ramsay's trial counsel asked what had prompted the decision to arrest Ramsay. Spanel replied that Ramsay was arrested because in comparing his statement to one given by Miley, it was apparent Ramsay "was withholding information and was not being a truthful witness." In direct response to another question from Ramsay's trial counsel, Spanel testified that Miley "admitted to discharging a firearm into the [James/Dietra Wilkinson] residence . . . and leaving with John Ramsay and leaving the area in a car that John Ramsay was driving."

After ruling that both the tape-recorded statement of Ramsay and a related diagram were made voluntarily, the trial judge specifically addressed Ramsay's counsel and stated that the court was "concerned" about certain questions counsel had asked of Spanel about what other officers had heard from Miley regarding Ramsay, noting that asking for hearsay evidence "may not be the most appropriate thing."

When trial resumed, Spanel identified the tape-recorded statement given by Ramsay and a typed transcript, as well as the related diagram, which were all received in evidence. In the statement, Ramsay admitted that he was driving Wimes' vehicle on December 19 and 20, 1997, and that he drove Miley to and from the James/Dietra Wilkinson residence. He stated that he parked the car in front of the residence on Starr Street, facing west, and entered the residence with Miley. Ramsay stated that he left the party after less than an hour and waited in the vehicle for Miley, who told him that he wanted to drink a "couple beers" before leaving. Ramsay stated that when Miley subsequently left the party and returned to the vehicle, Ramsay drove to his home. He denied any knowledge of the shooting.

On cross-examination, Spanel admitted that Ramsay made no statement indicating that he was present when Miley fired the shots or that he knew of Miley's intent to do so. Spanel was asked by Ramsay's trial counsel if he had "any evidence that would indicate that [Ramsay] was not, in fact, sitting in his car listening to music when this incident occurred," and Spanel responded in the negative. Ramsay's trial counsel then asked what evidence in Ramsay's statement prompted his arrest. Spanel replied that Ramsay lied to him about where the car had been parked when the shooting occurred. Following this, Ramsay's trial counsel asked Spanel whether he had "any evidence that you can share with this Court and this jury that would indicate that John Ramsay aided and abetted the discharge of a firearm into that residence?" Before a response was given, the trial judge called counsel to the bench and restated his previously expressed concern regarding the elicitation of hearsay testimony during cross-examination of the State's witness. Ramsay's counsel then withdrew the pending question.

After the State rested, Ramsay moved for dismissal and a directed verdict. Both motions were denied. Ramsay presented no evidence. Before closing arguments, Ramsay's counsel made an oral motion in limine, requesting that the State not be allowed to use the terms "agreement" and "getaway car" in closing because there was no evidence to support the use of the terms. In overruling the motion, the court noted that on cross-examination, Myers relayed what Jones told her about Ramsay and

Miley getting into the car and stated, "Quite frankly, that's one of the main reasons this case is still pending for the jury to look at." The jury found Ramsay guilty of count I, aiding and abetting the unlawful discharge of a firearm, and not guilty of count II, aiding and abetting the use of a deadly weapon to commit a felony. Ramsay was sentenced to 7 to 10 years' imprisonment, and now appeals.

## ASSIGNMENTS OF ERROR

Ramsay asserts, restated, that (1) the evidence presented at trial was insufficient to sustain his conviction; (2) he was denied effective assistance of counsel due to his trial counsel's reckless cross-examination of witnesses which introduced prejudicial hearsay into evidence; (3) the trial court erred in not declaring, on its own motion, a mistrial due to his trial counsel's ineffective assistance; and (4) he was denied effective assistance of counsel due to his trial counsel's failure to request a suppression hearing regarding his statement to police and due to his trial counsel's ineffectiveness during the hearing on the voluntariness of the statement Ramsay had made to police.

## SCOPE OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Garza,* 256 Neb. 752, 592 N.W.2d 485 (1999); *State v. Larsen,* 255 Neb. 532, 586 N.W.2d 641 (1998).

## ANALYSIS

Ramsay was convicted of aiding and abetting the unlawful discharge of a firearm in violation of Neb. Rev. Stat. § 28-1212.02 (Reissue 1995), which provides that "[a]ny person

who intentionally discharges a firearm at an inhabited dwelling house . . . shall be guilty of a Class III felony," and Neb. Rev. Stat. § 28-206 (Reissue 1995), which provides that "[a] person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender." Aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor; however, no particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. *State v. Larsen, supra*; *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74 (1998); *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996). Evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory. *State v. Larsen, supra*; *State v. Arnold, supra*; *State v. Trackwell*, 235 Neb. 845, 458 N.W.2d 181 (1990). When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if it is shown that the aider and abettor knew that the perpetrator of the act possessed the required intent or that the aider and abettor himself or herself possessed such. *State v. Arnold, supra*; *State v. Mantich, supra*; *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995).

The eyewitness testimony of Huffman and Dana Wilkinson constitutes direct evidence that Miley intentionally discharged a firearm into an inhabited residence during the early morning hours of December 20, 1997. In the statement he gave to police, Ramsay admitted that he transported Miley to the residence on the date of the shooting. However, because the offense of unlawful discharge of a firearm requires a specific intent, in order to convict Ramsay as an aider and abettor, the State was required to prove either that he intended to discharge a firearm into the residence or that he knew that Miley possessed such an intent prior to committing the act. See *State v. Mantich, supra*.

■ Intent may be inferred from the words and acts of the accused and from the facts and circumstances surrounding the conduct. *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397

(1998); *State v. Robbins*, 253 Neb. 146, 570 N.W.2d 185 (1997). Two cases arising from the same factual circumstances, *State v. Mantich, supra,* and *State v. Brunzo, supra,* provide examples of evidence sufficient to establish the requisite intent under an aider and abettor theory. Gary Brunzo and Douglas Mantich were among a group of 40 to 50 people who gathered following a gang-related killing. The general mood of those attending the gathering was one of depression or anger over the death. Several members of the group, including Brunzo, Daniel Eona, and Juan Carrera, carried guns to the gathering, and Carrera said that he wanted to shoot a member of the gang thought to be involved in the killing. As the larger group began to disperse, a smaller group consisting of Mantich, Brunzo, Eona, Carrera, and Angel Huerta were standing together when Eona expressed an intent to steal an automobile. Brunzo and Eona then left, returning a short time later in a minivan which had been carjacked. Henry Thompson, who had been driving the minivan at the time of the carjacking, was hunched over in the front between Eona, who was driving, and Brunzo. Against the urging of his girl friend, Mantich entered the minivan along with Carrera and Huerta, and Eona drove away as others in the minivan verbally taunted Thompson, demanded money, and threatened to shoot him. After several minutes of this, someone in the minivan shot and killed Thompson, but the identity of the shooter was not determined.

Mantich was convicted of felony murder and on appeal asserted that the evidence was insufficient to sustain his conviction. Noting that the State was required to prove that Mantich either personally intended to commit the underlying felonies of robbery or kidnapping or aided and abetted another person whom he knew to have such intent, we concluded that the evidence was sufficient to sustain his conviction because he participated in and encouraged the restraint and verbal terrorization of Thompson, which immediately preceded Thompson's death at the hands of someone in the group that included Mantich. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996). Brunzo was also convicted of felony murder and on appeal argued that the evidence was insufficient to establish that he had the requisite intent as an aider and abettor. We rejected this argument based

upon evidence which included proof that Brunzo had a gun in his possession when Eona initially suggested a carjacking, that he and Eona appeared a short time later in an unfamiliar minivan with Thompson kneeling between the front seats with his hands behind his head, and that Brunzo dragged Thompson's body from the minivan after the shooting, leaving it in the street as he reentered the vehicle. *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995).

In the present case, the record is devoid of any statements by Ramsay from which the requisite intent could be inferred. There is no evidence that Ramsay heard Miley express an intent to discharge a firearm into the residence or that he observed any conduct on the part of Miley which would have suggested such intent. There is no evidence that Ramsay was involved in or observed the argument which resulted in Miley's ejection from the party, and the only evidence that he was even aware of the argument was his statement to police that Miley told him that "there had been a little argument at the party, but it was all over." Dietra Wilkinson stated that she did not hear anyone at the party encourage Miley to commit any unlawful act. Of particular significance is the complete absence of any evidence, direct or circumstantial, supporting an inference that Ramsay knew that Miley had a firearm in his possession prior to the shooting. Dana Wilkinson and Huffman testified that they did not observe Ramsay anywhere in the vicinity when they observed Miley firing the weapon at the residence. Dana Wilkinson testified that when she encountered Miley outside the residence, she did not notice the firearm in his hand until he "raised his arms up" and pointed it at her. The weapon fired by Miley was not received in evidence, but Dana Wilkinson testified that "it looked like a flat box, like a VCR tape with a silver thing sticking out of it," suggesting a handgun capable of being concealed on Miley's person.

The record does contain evidence from which a jury could conclude beyond a reasonable doubt that Ramsay drove the vehicle which transported Miley from the scene of the shooting and that he was not truthful in his statements to police regarding where the vehicle had been parked and where he and Miley had gone after leaving the scene. While it may be argued that this

evidence supports an inference that Ramsay became aware of the shooting after it occurred, it does not tend to prove that Ramsay intended to commit the shooting or that he knew that Miley had such an intention prior to the act itself. We note that Ramsay was not charged with being an accessory to a felony under Neb. Rev. Stat. § 28-204 (Reissue 1995), which encompasses acts committed "with intent to interfere with, hinder, delay, or prevent the discovery, apprehension, prosecution, conviction, or punishment of another for an offense."

■ Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Brunzo, supra; State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993), *postconviction relief granted* 249 Neb. 381, 543 N.W.2d 725 (1996), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). We conclude that this is such a case because there is no direct or circumstantial evidence from which a jury could conclude beyond a reasonable doubt that Ramsay had the requisite intent to aid and abet Miley in the commission of the charged offense. Having reached this conclusion, we need not address Ramsay's other assignments of error.

## CONCLUSION

Because there is no evidence that Ramsay acted with the requisite criminal intent, we conclude, as a matter of law, that the evidence is insufficient to sustain his conviction for aiding and abetting the unlawful discharge of a firearm. The judgment of conviction and sentence is therefore reversed, and the cause remanded with direction to dismiss.

REVERSED AND REMANDED WITH
DIRECTION TO DISMISS.