considered on appeal. *Butler County Dairy v. Butler County*, 285 Neb. 408, 827 N.W.2d 267 (2013). We therefore decline to address this issue.

## CONCLUSION

We conclude that Cameron and Amanda failed to timely appeal from the orders denying the motions to transfer the cases to tribal court. As such, this court is without jurisdiction to address Cameron and Amanda's argument that the juvenile court erred in that respect. Upon our de novo review, we find that the State presented clear and convincing evidence that termination of Cameron's and Amanda's parental rights to Shane, Lena, Hanna, and Jadys was in the children's best interests. Accordingly, we affirm the orders of the juvenile court.

AFFIRMED.

———————————

State of Nebraska, appellee, v.
John T. Warrack, appellant.
___ N.W.2d ___

Filed January 7, 2014.    No. A-13-025.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions.

3. **Constitutional Law: Warrantless Searches: Search and Seizure.** Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.

4. **Constitutional Law: Search and Seizure: Words and Phrases.** Although every trespass, by definition, invades someone's right of possession, not every trespass violates the Fourth Amendment.

5. **Constitutional Law: Search and Seizure.** The Fourth Amendment protects people, not places.

6. ____: ____. To determine whether a person has an interest protected by the Fourth Amendment, one must question whether the person has a legitimate expectation of privacy in the invaded space.

7. ____: ____. A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable.

8. **Police Officers and Sheriffs: Warrants.** A police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

9. **Search and Seizure: Streets and Sidewalks.** Our society does not reasonably expect a sidewalk leading to one's front door to be private in the absence of evidence to the contrary.

10. **Trial: Evidence: Appeal and Error.** An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.

11. **Convictions: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

12. ____: ____: ____. The relevant question for an appellate court in reviewing a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

13. **Aiding and Abetting: Proof.** Aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor; however, no particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime.

14. ____: ____. Evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory.

15. **Aiding and Abetting: Intent: Liability.** When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if it is shown that the aider and abettor knew that the perpetrator of the act possessed the required intent or that the aider and abettor himself or herself possessed such.

16. **Criminal Law: Intent.** The question whether the defendant had the required criminal intent is a fact question for the jury.

17. ____: ____. A direct expression of intention by the actor is not required in determining criminal intent, because the intent with which an act is committed involves a mental process and intent may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.

18. **Criminal Attempt.** Whether a defendant's conduct constitutes a substantial step toward the commission of a particular crime and is an attempt is generally a question of fact.

19. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.

20. **Criminal Law: Effectiveness of Counsel.** A trial counsel's performance was deficient if it did not equal that of a lawyer with ordinary training and skill in criminal law.

21. **Effectiveness of Counsel: Appeal and Error.** In addressing the "prejudice" component of the test to determine ineffective assistance of counsel, an appellate court focuses on whether a trial counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.

22. **Effectiveness of Counsel: Proof.** To show prejudice in an ineffective assistance of counsel claim, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

23. **Proof: Words and Phrases.** A reasonable probability is a probability sufficient to undermine confidence in the outcome.

24. **Effectiveness of Counsel: Proof: Appeal and Error.** When an appellant does not allege both prongs of an ineffective assistance of counsel claim, deficient performance and prejudice, resolution of his or her assertions of ineffective assistance of counsel hinges not on the adequacy of the record before the appellate court, but on his or her failure to provide the appellate court with sufficient allegations of ineffective assistance of counsel.

25. ____: ____: ____. When an appellant does not sufficiently allege his or her ineffective assistance of counsel claims, an appellate court is constrained to find that the assertions of ineffective assistance of counsel are without merit.

Appeal from the District Court for Lancaster County: Karen B. Flowers, Judge. Affirmed.

Michelle M. Mitchell, of Mitchell Law Office, for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Inbody, Chief Judge, and Irwin and Riedmann, Judges.

Riedmann, Judge.

## I. INTRODUCTION

John T. Warrack appeals from his convictions in the district court for Lancaster County on aiding and abetting delivery of methamphetamine within 1,000 feet of a school and attempted delivery of methamphetamine. He argues that the district

court erred in failing to grant his motion to suppress, that his foundational objection to certain testimony should have been sustained, that the evidence was insufficient to sustain the convictions on both counts, and that he received ineffective assistance of counsel. We affirm the convictions in all respects.

## II. BACKGROUND

Jordan Wilmes is an investigator with the Lincoln-Lancaster County narcotics task force. In May 2011, a confidential informant (CI) informed Wilmes that an individual with the street name "Chicago" was involved with methamphetamine sales. The CI provided Wilmes with a telephone number for Chicago. The CI placed a recorded call to Chicago on May 23, indicating that he was looking for an "eight ball" for a client. The term "eight ball" refers to one-eighth of an ounce of drugs.

In response to the CI's request, Chicago stated that his "guy" could get what the CI wanted for "three and a quarter." Wilmes testified at trial that "three and a quarter" referred to a price of $325 for the quantity of drugs requested. Wilmes testified that the recorded call was a typical conversation arranging for a drug purchase, where the individuals discuss whom the drugs are for, a price, and a quantity.

The CI placed another recorded call to Chicago on May 27, 2011, and indicated that his client was "still looking for that ice cream." The term "ice cream" is a common term for methamphetamine. Chicago asked whether the CI was still looking for the same amount, an "eight ball." The CI confirmed that he was.

On May 31, 2011, the CI again placed a recorded telephone call to Chicago. During that call, the CI told Chicago that he was going to have his client, "Chris," who was really Wilmes working undercover, contact Chicago. Shortly thereafter, Wilmes, acting as Chris, placed a recorded call to Chicago. Wilmes asked Chicago for a "t-shirt" and a "'T.'" These terms represent one-sixteenth of an ounce of drugs. Chicago indicated the price for a "T" would be $210. After this series of telephone calls, Wilmes understood that he was

going to be meeting with Chicago for the purpose of purchasing methamphetamine.

After the telephone calls, Wilmes exchanged text messages with Chicago, and they established a lower price for the drug and a place to meet. After Wilmes arrived at the agreed-upon location, he received a telephone call from Chicago changing the location. Wilmes provided a description of his vehicle to Chicago, and Chicago asked Wilmes to park at the northeast corner of 14th and C Streets and wait for him.

Once Wilmes was parked at the intersection of 14th and C Streets, he observed a middle-aged black male and a middle-aged white female approaching his vehicle. The male opened the passenger door of Wilmes' vehicle and told Wilmes that he was going to have the female "hook [him] up with what [he] was trying to get." Wilmes recognized the man's voice from the telephone calls he had exchanged with the individual known as Chicago. The male then left, and the female, later identified as Rabbeca Seaman, got into Wilmes' vehicle.

Seaman told Wilmes her name was "Becca," and Wilmes introduced himself as "Chris." Wilmes informed Seaman of his dealings with Chicago and told her that he was looking to acquire "drugs or dope." Wilmes gave Seaman $200, and she left her purse in the vehicle as collateral. Seaman got out of the vehicle and entered a house on the southeast corner of 14th and C Streets. She returned to the vehicle shortly thereafter and gave Wilmes a bag containing a substance later confirmed to be methamphetamine.

On June 14, 2011, Wilmes placed another recorded telephone call to Chicago. In the call, Wilmes reminded Chicago that he was "[w]hite boy Chris in the green car," and indicated that he was "trying to get something tonight" but that he was unable to reach Seaman. Wilmes asked to purchase an "eight ball," and they arranged to meet at the "same place."

Wilmes arrived at the intersection of 14th and C Streets, where a man with a tattoo on his neck that read "Chicago" got into Wilmes' vehicle. It was the same man Wilmes had met on May 31, 2011. Warrack directed Wilmes to drive to an apartment complex near 14th and D Streets. Wilmes indicated that he had $200, and they discussed the quantity that Wilmes

wanted to buy. Warrack then asked Wilmes to "front him the money" so that he could go purchase the methamphetamine. Wilmes asked Warrack to leave collateral to ensure that he would return with the methamphetamine, so Warrack gave Wilmes a set of keys. Warrack then took the $200, got out of Wilmes' vehicle, and began walking northbound across D Street. Wilmes waited for approximately 30 to 45 minutes, but Warrack never returned. Wilmes' subsequent telephone calls to Warrack went unanswered.

In early November 2011, Lincoln police officer Timothy Cronin was directed to arrest Warrack for the theft of $200 from Wilmes. On November 11, Cronin and Lincoln police investigator Jeff Sorensen were driving in Lincoln, when they observed Warrack sitting on the porch of his home. Cronin and Sorensen parked their vehicle and approached the residence on foot. Cronin walked up onto the porch and identified himself as a police officer. Sorensen was standing either on the porch or on the steps leading from the sidewalk up to the porch. Cronin asked Warrack to step down off the porch so they could talk on the sidewalk, and he did so. Once Warrack was on the sidewalk, he was arrested for theft and transported to jail.

Warrack was booked into jail and placed in an interview room, advised of his *Miranda* rights, and questioned by Cronin and Sorensen. With respect to the May 31, 2011, incident, Warrack told the officers that someone named "Chris" had contacted him, looking to purchase an "eight ball" of methamphetamine. Warrack stated that he told Chris that he knew someone from whom Chris could purchase methamphetamine, in reference to Seaman. Warrack said that he agreed to meet Chris at 14th and C Streets and pointed him out to Seaman upon arrival. Warrack stated that that was the extent of his involvement and commented that Chris called him first, that he only "'hooked [Chris] up with [Seaman],'" and that he "'never touched anything.'" Cronin testified that Warrack stated two or three times, "'All I did was set it up.'"

The officers also asked Warrack about the June 14, 2011, incident, and initially, he denied any involvement. When Cronin told Warrack that he had personally observed Warrack

meeting with Wilmes, Warrack admitted that he did meet with Wilmes but denied taking any money from him. Warrack stated to Cronin that he did not sell methamphetamine to Wilmes because he knew Wilmes was an undercover officer.

Warrack was subsequently charged with aiding and abetting delivery of methamphetamine within 1,000 feet of a school and attempted delivery of methamphetamine. Prior to trial, Warrack filed a motion to suppress the statements he made to the officers, arguing that the statements were the result of an illegal arrest. The district court denied Warrack's motion, concluding that he was lawfully arrested.

A jury trial was held on November 5 and 6, 2012. The jury ultimately found Warrack guilty of both offenses, and he was sentenced to 3 to 6 years' imprisonment on count I and a consecutive sentence of 1 to 2 years' imprisonment on count II. Warrack timely appeals to this court.

## III. ASSIGNMENTS OF ERROR

Warrack assigns, summarized and renumbered, that the district court erred in (1) overruling his motion to suppress, (2) overruling his foundational objection to certain testimony, and (3) finding sufficient evidence to sustain the convictions on both counts. He also assigns that he received ineffective assistance of counsel.

## IV. ANALYSIS

### 1. Motion to Suppress

[1] Warrack argues that the district court erred when it failed to grant his motion to suppress evidence based on an illegal arrest. In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. Regarding historical facts, we review the trial court's finding for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d 359 (2012).

[2,3] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals

against unreasonable searches and seizures by the government. These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions. *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010). Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications. *Smith, supra*.

[4-7] Although every trespass, by definition, invades someone's right of possession, not every trespass violates the Fourth Amendment. *State v. Ramaekers*, 257 Neb. 391, 597 N.W.2d 608 (1999). The "'"Fourth Amendment protects *people, not places*."'" 257 Neb. at 394, 597 N.W.2d at 611 (emphasis in original) (quoting *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). Therefore, to determine whether a person has an interest protected by the Fourth Amendment, one must question whether the person has a legitimate expectation of privacy in the invaded space. *Ramaekers, supra*. A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. *Id*.

Warrack cites *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013), to argue that Cronin and Sorensen effectuated an unlawful arrest when they physically entered and occupied an area immediately surrounding his home, which is curtilage and protected by the Fourth Amendment. In *Jardines*, police officers took a drug-sniffing dog onto the defendant's porch and the dog alerted the officers to narcotics inside the home. One of the officers then received a warrant to search the residence. The trial court granted the defendant's motion to suppress based upon an illegal search.

The U.S. Supreme Court granted certiorari, limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment. On appeal, the Court confirmed that the porch area where the officers were gathering information is an area that enjoys protection as part of the home itself. Despite this protection, tradition in our country allows a visitor to approach a home by the front path, knock

promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. See *Jardines, supra*. However, the Court found that introducing a trained police dog to explore this area in hopes of discovering incriminating evidence was "something else." 133 S. Ct. at 1416. The Court stated that "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id*. Based on this finding, the Court concluded that the defendant's motion to suppress was properly granted.

[8] *Jardines* is distinguishable from the present case. The use of the drug-sniffing dog on the defendant's porch was found to be a trespassory invasion because it was being used to discover evidence and, thus, constituted a "search" for Fourth Amendment purposes. In this case, the officers did not conduct a search or seizure on Warrack's porch. Rather, they merely stepped onto the porch to request that Warrack step down to the sidewalk, which he did willingly. As the Supreme Court iterated in *Jardines*, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" 133 S. Ct. at 1416 (quoting *Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011)). As such, the officers' mere presence on Warrack's porch was permissible.

We conclude that Warrack's arrest was lawful, because the officers were authorized to step onto Warrack's porch and speak with him and Warrack willingly left his porch and was arrested on the sidewalk, a location in which he had no reasonable expectation of privacy. In *State v. Boysaw*, 228 Neb. 316, 422 N.W.2d 346 (1988), the Nebraska Supreme Court upheld the warrantless arrest of the defendant. Based on the trial court's findings of fact, the defendant was inside his home when he observed police officers arrive. He went to the doorway as the officers came onto the porch, he opened the door, and he asked whether he could help them. The officers asked the defendant to step outside; the defendant did so and was arrested. The trial court determined that although officers asked the defendant to step outside, he had not been intimidated into leaving his residence, and that he was not arrested until he left the protection of his residence, at which time

he no longer had a reasonable expectation of privacy. Upon finding support in the record for the trial court's factual findings, the Supreme Court concluded that the defendant's arrest was lawful.

Likewise, in this case, Warrack was not intimidated into leaving his porch and he was arrested in a location where he had no reasonable expectation of privacy. Cronin and Sorensen asked Warrack to step onto the sidewalk, and he did so cooperatively. The district court found that although the officers identified themselves as police officers, they did not draw their guns, touch Warrack in any way, or otherwise try to intimidate or coerce him. These factual findings are consistent with the testimony of Cronin and Sorensen.

[9] Once Warrack was on the sidewalk, he was placed under arrest. As the Nebraska Supreme Court recognized in *State v. Ramaekers*, 257 Neb. 391, 597 N.W.2d 608 (1999), our society does not reasonably expect a sidewalk leading to one's front door to be private in the absence of evidence to the contrary. There is nothing in the record to indicate Warrack attempted to make the sidewalk leading to his home private. In fact, Cronin testified that he and Sorensen were able to freely walk from the sidewalk up to the porch. We therefore conclude that Warrack did not have a reasonable expectation of privacy in the location at which he was arrested. As such, his arrest was lawful, and the district court did not err in denying his motion to suppress.

## 2. Foundational Objection

Lincoln police officer Todd Kozian testified at trial regarding his involvement in this case. Kozian assisted Wilmes in measuring the distance from the elementary school located at 11th and C Streets to the location where the drug transaction between Wilmes and Seaman occurred. An aerial map depicting the area from approximately 11th Street to 14th Street and A Street to D Street was received into evidence.

Kozian testified that he obtained the measurements using a "Lidar" device, which is a laser that measures speed and distance. From the northeast corner of 14th and C Streets, the location where Wilmes told Kozian the transaction occurred,

Kozian was unable to get a clear line of sight to the school because there were houses obstructing his view. To get a clear view, he moved into the intersection to obtain the distance. At trial, he marked the aerial map with a red "x" to show the location where he was standing.

During direct examination, Kozian was asked to use the legend on the aerial map to estimate the approximate distance from his marked location to the location of the house that Seaman entered to purchase the methamphetamine. Warrack asserted a foundational objection to the question, which the court overruled. Kozian then estimated the distance as approximately 100 feet. On appeal, Warrack claims the district court erred in overruling his objection.

[10] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *State v. Richardson*, 285 Neb. 847, 830 N.W.2d 183 (2013).

Warrack cites *Richardson* to argue that there was insufficient foundation establishing the accuracy of Kozian's estimate, that Kozian's ability to estimate distance and the aerial map were not compared to a standard, and that there was no evidence that the scale of the map was accurate. The principles discussed in *Richardson* apply only to electronic or mechanical measuring devices, and Warrack urges us to find that Kozian himself and the aerial map were "measuring devices." We decline to do so, because witnesses and maps are not electronic or mechanical. Thus, *Richardson* is not applicable for the issue at hand.

We conclude that the district court did not abuse its discretion in overruling Warrack's foundational objection to Kozian's estimate. The map from which Kozian estimated the distance was offered into evidence by the State on three occasions and received each time without objection from Warrack. Any concerns Warrack had regarding the accuracy of the legend should have been resolved through objection to admission of the exhibit, not objection to Kozian's testimony based on the map. Thus, the map was properly before the jury as an exhibit and available for the jury's consideration during deliberations. Whether Kozian's estimated distance using the

map's legend was accurate was simply a matter of whether the jury found his testimony credible, and any questions concerning the credibility of a witness are solely for the jury as finder of fact to resolve. See *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). Accordingly, this assignment of error is without merit.

### 3. Sufficiency of Evidence

[11,12] Warrack argues that there was insufficient evidence to support his convictions. In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. Because we have detailed the facts in the background section of this opinion, we do not restate them in detail below.

### (a) Aiding and Abetting

Warrack was charged with aiding and abetting delivery of methamphetamine within 1,000 feet of a school, in violation of Neb. Rev. Stat. §§ 28-416(4)(a)(ii) (Cum. Supp. 2012) and 28-206 (Reissue 2008). Section 28-416(4)(a)(ii) prohibits any person 18 years of age or older from knowingly or intentionally delivering a controlled substance within 1,000 feet of the real property comprising a public elementary school. Section 28-206 provides that a person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he or she were the principal offender.

Warrack claims that the State failed to prove three essential elements of the charged offense: (1) that he was "Chicago," (2) that he possessed the required knowledge or intent to commit the charged offense, and (3) that the drug transaction occurred within 1,000 feet of a school. In general, Warrack argues that

"unreliable, inconsistent and conflicting testimony" along with Kozian's unreliable estimated distance resulted in the State's failure to meet its burden. Brief for appellant at 43. We reject Warrack's arguments and find that the State adduced sufficient evidence so that a rational jury could have found all elements of the offense beyond a reasonable doubt.

### (i) Identity

Warrack first argues that the evidence was insufficient to show that he was the person with whom Wilmes exchanged telephone calls and text messages. We conclude the evidence was sufficient for a rational jury to find that Warrack was "Chicago."

As set forth above, Wilmes exchanged multiple telephone calls and text messages with an individual with the street name "Chicago." When Wilmes arrived at the designated location on May 31 and June 14, 2011, he had contact with an individual whose voice he recognized as the man on the telephone with whom he made arrangements for a drug deal.

Seaman testified that she and Warrack used to be neighbors and that she knows him by the names "John," "Travante," and "Chicago." She testified that Warrack picked her up on May 31, 2011, so that she could buy methamphetamine from a man named "Jessie" and provide the drugs to Warrack to sell to someone else. On the way to Jessie's house, Warrack was talking on his cell phone, asking the person with whom he was speaking what type of vehicle he or she was driving. Seaman and Warrack then met up with Wilmes. Warrack told Wilmes that Seaman would "hook [him] up," and Seaman ultimately sold methamphetamine to Wilmes. We also note that Warrack has a tattoo on his neck that reads "Chicago."

In addition to the above testimony, Warrack, himself, made admissions to Cronin and Sorensen about his conversations with someone named "Chris" and the steps he took to meet him at 14th and C Streets. Based on the foregoing, we conclude that the evidence was sufficient for a rational jury to conclude that Warrack was the person who exchanged telephone calls and text messages with Wilmes.

### (ii) Knowledge or Intent

[13-15] Warrack also claims the State failed to prove that he intended for Seaman to deliver methamphetamine or that he knew she intended to do so. Aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor; however, no particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. *State v. Ramsay*, 257 Neb. 430, 598 N.W.2d 51 (1999). Evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory. *Id*. When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if it is shown that the aider and abettor knew that the perpetrator of the act possessed the required intent or that the aider and abettor himself or herself possessed such. *Id*.

Seaman's testimony that she accepted $200 from Wilmes and, in exchange, provided him with methamphetamine constitutes direct evidence that she knowingly or intentionally delivered methamphetamine to Wilmes. Because the offense requires a specific intent, in order to convict Warrack as an aider and abettor, the State was required to prove either that he intended to deliver methamphetamine or that he knew Seaman possessed such an intent prior to committing the act. See *id*.

[16,17] The question whether the defendant had the required criminal intent is a fact question for the jury. *State v. Scott*, 225 Neb. 146, 403 N.W.2d 351 (1987), *disapproved on other grounds*, *State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989). A direct expression of intention by the actor is not required, because the intent with which an act is committed involves a mental process and intent may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Curlile*, 11 Neb. App. 52, 642 N.W.2d 517 (2002).

Viewing the evidence in a light most favorable to the State, we conclude that there is sufficient evidence for a rational jury to find that Warrack intended to deliver methamphetamine or knew that Seaman possessed such an intent. From the testimony of Wilmes and Seaman outlined above, the jury could infer that the sale of methamphetamine from Seaman to Wilmes occurred because Warrack arranged it.

Moreover, the statements Warrack made to Cronin and Sorensen after he was arrested provides sufficient evidence that Warrack knew Seaman intended to deliver methamphetamine. His comments that "'[Chris] called me first,'" "'All I did was set it up,'" and "'I hooked him up with [Seaman]'" provide sufficient evidence to support the jury's finding that Warrack intended to deliver methamphetamine or knew that Seaman possessed such an intent.

### (iii) Distance From School

Warrack also alleges that the State failed to prove that Seaman delivered methamphetamine within 1,000 feet of a school. He argues that the discrepancies between Seaman's and Wilmes' testimony along with Kozian's estimated distance rendered the evidence doubtful and lacking as to the element of "within 1,000 feet of a school."

Wilmes testified that the drug transaction with Seaman occurred on the northeast corner of 14th and C Streets. An elementary school is located at 11th and C Streets. Kozian attempted to measure the distance from the school to the northeast corner of 14th and C Streets, but he had to move out into the intersection in order to have a clear line of sight to the school. The distance from the intersection to the northeast corner of the school building was 888 feet. The distance from the intersection to the northeast corner of the school property line was 623 feet. We conclude that this evidence is sufficient for a rational jury to have found that Seaman delivered the methamphetamine to Wilmes within 1,000 feet of a school.

In general, in support of this assignment of error, Warrack makes several arguments as to why he believes the evidence was insufficient to support his conviction, but what he is

asking us to do is reweigh the evidence presented to the jury. This we cannot do. See *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011). Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient for the jury to find Warrack guilty of aiding and abetting delivery of methamphetamine within 1,000 feet of a school.

### (b) Attempted Delivery

[18] Warrack was charged with attempted delivery of methamphetamine in violation of § 28-416(1) and Neb. Rev. Stat. § 28-201 (Cum. Supp. 2010). Section 28-416(1) prohibits any person from knowingly or intentionally delivering a controlled substance. Under § 28-201(1)(b), a person is guilty of an attempt to commit a crime if that person "engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime." Whether a defendant's conduct constitutes a substantial step toward the commission of a particular crime and is an attempt is generally a question of fact. *State v. Babbitt*, 277 Neb. 327, 762 N.W.2d 58 (2009).

Warrack argues that the State failed to prove that he intended the result of his actions to be the delivery of methamphetamine, if the circumstances were as he believed them to be, and failed to prove that he took a substantial step toward that end. He claims that it was not possible for him to complete a methamphetamine delivery, because he did not have methamphetamine on his person.

We are not persuaded that the absence of methamphetamine on Warrack's person at the time he was in Wilmes' vehicle made it impossible for him to commit the offense. The facts reveal that the process by which Warrack delivered methamphetamine was by arranging a meeting via telephone, arriving at the agreed-upon location, accepting money either personally or through Seaman, leaving collateral, going elsewhere to obtain the methamphetamine, and then returning to deliver the drugs to Wilmes.

When we view the evidence most favorable to the State, the record shows that Warrack completed all of the above steps, with the exception of returning to the vehicle to deliver the drugs.

Warrack argues that "[t]heft of money cannot be said to be strongly corroborative of a person's intent to deliver methamphetamine." Brief for appellant at 50. Theft of money alone may not be sufficient evidence from which to infer an intent to deliver drugs, but the theft must be viewed in the context of the circumstances surrounding this incident. By Warrack's agreeing to meet with Wilmes after Wilmes indicated he was looking for an "eight ball," arriving at the agreed-upon location, discussing the transaction, and accepting money while leaving collateral behind, a jury could find that Warrack intended to deliver methamphetamine.

Warrack also claims the State failed to prove that Warrack intended to deliver methamphetamine, specifically. Again we must look at the facts surrounding the incident and consider the totality of the circumstances. When the CI and Warrack communicated in May 2011, the CI indicated that his client, Chris, was looking for some "ice cream," a common term used to describe methamphetamine. Warrack arranged for the delivery of methamphetamine to Wilmes through Seaman. When Wilmes contacted Warrack again, on June 14, Wilmes indicated that he was looking to "get something" and they arranged to meet at the "same place." According to Wilmes, after Warrack got into Wilmes' vehicle, they "had a conversation regarding methamphetamine." Wilmes testified that Warrack told him that he needed Wilmes to "front him the money first to get the methamphetamine and bring it back to [Wilmes]." This evidence was sufficient to support the jury's finding that Warrack intended to deliver methamphetamine, specifically.

Based on the foregoing, we conclude that the State adduced sufficient evidence so that a rational jury could find that Warrack intentionally engaged in conduct that constituted a substantial step toward the delivery of methamphetamine. Accordingly, this assignment of error is without merit.

### 4. Ineffective Assistance
### of Counsel

[19] Warrack claims that he received ineffective assistance of counsel in six respects. To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order. See *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012).

[20-23] A trial counsel's performance was deficient if it did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. In addressing the "prejudice" component of the test, an appellate court focuses on whether a trial counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. See *id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

Warrack alleges that he received ineffective assistance of counsel in six respects. His brief on these claims is limited to the general argument that trial counsel was ineffective and a brief recitation of how his counsel's performance was deficient. In a conclusory, general statement, Warrack claims that these six failures of trial counsel prejudiced him; he does not, however, allege *how* any of these actions prejudiced him or how the result would have been different but for his counsel's deficient performance.

[24,25] The issue with respect to these claims is not the sufficiency of the record, but the sufficiency of the allegations. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that he or she was prejudiced by such deficiency. See *State v. Derr*, 19 Neb. App. 326, 809 N.W.2d 520 (2011). When an appellant does not allege both prongs of an ineffective assistance of counsel claim, "resolution of his

assertions of ineffective assistance of counsel hinge[s] not on the adequacy of the record before us, but on his failure to provide this court with sufficient allegations of ineffective assistance of counsel." *Id*. at 329, 809 N.W.2d at 523. As we held in *Derr*, when an appellant does not sufficiently allege his or her ineffective assistance of counsel claims, we are constrained to find that the assertions of ineffective assistance of counsel are without merit. Accordingly, we find Warrack's allegations to be insufficient because he fails to allege how he was prejudiced by his counsel's performance.

### (a) Failure to Question Jurors
### on Racial Bias

Warrack claims his trial counsel was ineffective for failing to question prospective jurors in a manner in which to identify any racial bias. He does not identify, however, how this failure prejudiced him or how the outcome would have been different had his counsel posed such questions. This assertion is therefore meritless.

### (b) Failure to Confer and
### Consult With Warrack

Warrack alleges his trial counsel was ineffective for failing to confer and consult with him regarding his case so as to allow him to make informed decisions regarding his defense. Warrack concedes that the communication between trial counsel and him is not contained in the record, but he does not direct our attention to any specific decisions on which he was not consulted or explain how this failure prejudiced him. Accordingly, we reject this claim.

### (c) Failure to Ensure
### Mental Competency

Warrack claims his trial counsel was ineffective for failing to ensure his mental competency prior to trial and sentencing. He fails to indicate how the result of the proceeding would have likely been different but for counsel's deficient performance. Thus, this assertion has no merit.

### (d) Failure to Request Limiting
### Jury Instruction

Warrack alleges his trial counsel was ineffective for failing to request a limiting jury instruction regarding each offense. Warrack simply explains that trial counsel filed a motion to sever the two counts contained in the second amended information, and the district court overruled the motion. He notes that trial counsel renewed the motion to sever at the beginning of trial, but did not request a limiting jury instruction. Again, Warrack failed to allege how he was prejudiced by this action. As such, we must reject this claim.

### (e) Failure to Obtain Ruling
### on Motion in Limine

Warrack claims his trial counsel was ineffective for failing to obtain a ruling on the State's motion in limine. Prior to trial, the State filed a motion in limine seeking to prohibit Warrack from making any efforts to change or conceal the tattoo on his neck. The State also requested the court's permission to photograph the tattoo. Warrack's trial counsel indicated that she was unsure of her position on the request to photograph the tattoo, and the court directed her to file either an objection or no objection so that the court could issue an order. Trial counsel never made either filing, and the State's photographs of the tattoo were received into evidence at trial with no objection.

As discussed above, there was sufficient evidence presented for the jury to find that Warrack was "Chicago." More important, in his ineffectiveness claim, Warrack does not allege how he was prejudiced by the introduction of the photographs. Accordingly, this assertion is without merit.

### (f) Failure to File Motion
### for New Trial

Warrack alleges his trial counsel was ineffective for failing to file a motion for new trial. He notes that trial counsel moved for a dismissal of both counts or, in the alternative, a directed verdict of acquittal on both counts based upon insufficiency of the evidence, yet failed to file a motion for new trial based

upon the same grounds. As we previously concluded, the evidence was sufficient to sustain Warrack's convictions on both counts. Because Warrack fails to allege how he was prejudiced by this action, we reject this claim.

## V. CONCLUSION

We conclude Warrack's arrest was lawful, because he was not arrested until he had willingly stepped from his porch onto the sidewalk and he had no reasonable expectation of privacy on the sidewalk. Therefore, the district court did not err in denying his motion to suppress. In addition, the court properly overruled Warrack's foundational objection to Kozian's testimony, because Kozian's credibility was a matter solely for the jury to determine. We also find that the State adduced sufficient evidence to support Warrack's convictions on both counts. Finally, we reject all six of Warrack's claims of ineffective assistance of counsel because he failed to allege how he was prejudiced by trial counsel's actions. Accordingly, we affirm Warrack's convictions for aiding and abetting delivery of methamphetamine within 1,000 feet of a school and attempted delivery of methamphetamine.

AFFIRMED.

───────────

In re Interest of Athina M., a child
under 18 years of age.
State of Nebraska, appellee, v.
Darwin M., appellant.
___ N.W.2d ___

Filed January 7, 2014.    No. A-13-189.

1. **Juvenile Courts: Evidence: Appeal and Error.** Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. However, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.